DONNA MACKENZIE ET AL. *v.* PLANNING
AND ZONING COMMISSION OF THE
TOWN OF MONROE ET AL.
(AC 34919)

Gruendel, Bear and Sheldon, Js.

Argued April 25—officially released October 15, 2013

*Kevin J. Gumpper*, for the appellants (plaintiffs).

*Peter V. Gelderman*, with whom were *John P. Fracassini*, town attorney, and *Raymond W. Ganim*, for the appellee (defendant Real Time Investments, LLC).

*Opinion*

GRUENDEL, J. The plaintiffs, Donna MacKenzie, David W. Santarsiero and Colleen M. Santarsiero, appeal from the judgment of the Superior Court dismissing their appeal from the decisions of the defendant Planning and Zoning Commission of the Town of Monroe (commission) granting a special exception to the defendant Real Time Investments, LLC, pursuant to § 117-1800 of the Monroe Zoning Regulations (regulations), and approving its request for a zone change pursuant to § 117-900 of the regulations.[1] The plaintiffs contend that the court improperly concluded that (1) the commission, in granting the special exception, possessed the authority to vary the setback and landscaped buffer requirements set forth in the regulations, and (2) the notice of the proposed zone change filed by the defendant with the town clerk satisfied the require-

---

[1] Although the commission also was named as a defendant in the underlying proceeding, it has not filed an appellate brief with this court. Rather, the commission filed a notice in which it adopted the brief of Real Time Investments, LLC. For clarity, we refer in this opinion to Real Time Investments, LLC, as the defendant.

ments of General Statutes § 8-3 (a).[2] We affirm in part and reverse in part the judgment of the Superior Court.[3]

At all relevant times, the defendant owned a 4.027 acre parcel of land known as 579 Main Street in Monroe (property). On November 4, 2010, the defendant filed an application with the commission requesting a zone change for a 1.15 acre portion of the property from "Residential and Farming District C (RC)" to "Design Business District 1 (DB1)." See Monroe Zoning Regs., § 117-100. As required by §§ 117-900 (A) and 117-907 (A) of the regulations, the defendant also requested a special exception and site plan approval in order to construct a McDonald's restaurant on the property.[4]

[2] General Statutes § 8-3 (a) provides: "Such zoning commission shall provide for the manner in which regulations under section 8-2 or 8-2j and the boundaries of zoning districts shall be respectively established or changed. No such regulation or boundary shall become effective or be established or changed until after a public hearing in relation thereto, held by a majority of the members of the zoning commission or a committee thereof appointed for that purpose consisting of at least five members. Such hearing shall be held in accordance with the provisions of section 8-7d. A copy of such proposed regulation or boundary shall be filed in the office of the town, city or borough clerk, as the case may be, in such municipality, but, in the case of a district, in the offices of both the district clerk and the town clerk of the town in which such district is located, for public inspection at least ten days before such hearing, and may be published in full in such paper. The commission may require a filing fee to be deposited with the commission to defray the cost of publication of the notice required for a hearing."

[3] In hearing appeals from decisions of a planning and zoning commission, the Superior Court acts as an appellate body. See General Statutes § 8-8; see also *Par Developers, Ltd.* v. *Planning & Zoning Commission*, 37 Conn. App. 348, 353, 655 A.2d 1164 (1995) (noting zoning appeals in which Superior Court "reviewed the agency's decision in an appellate capacity").

[4] Section 117-900 (A) of the regulations provides in relevant part: "In Design Districts, the existing use of land shall not be changed, and no building shall be erected or enlarged . . . until a site plan of development shall have been prepared by the owner of such land, and approved by the [c]ommission, and a [s]pecial [e]xception shall have been granted, where required by these regulations. . . ."

Section 117-907 (A) of the regulations provides: "A change of zone to a design district shall not become effective until the required special exception shall have been approved by the [c]ommission and a linen plot plan and two (2) blue line prints, showing the location of all proposed and existing

Those requests were set forth on a "uniform land use application" form, which specifies, inter alia, a "combined application" for both "design district zone change" and "special exemption permit." See *Pond View, LLC* v. *Planning & Zoning Commission*, 288 Conn. 143, 147, 953 A.2d 1 (2008).

The various maps and surveys in the record before us indicate that the defendant's property is largely a rectangular parcel whose northerly and southerly property lines are roughly four times as long as the easterly and westerly boundaries. The westernmost portion of the property is landlocked, contains wetlands, and is bordered exclusively by properties in the RC zone. The easternmost 0.65 acre portion of the property, which abuts Main Street, already is designated as part of the DB1 zone. In its application to the commission, the defendant sought to extend that DB1 zone on its property an additional 1.15 acres, running in a westerly direction from the 0.65 acre portion. If approved, the combined 1.80 acre portion would be bordered entirely by other properties located in the DB1 zone, save for a property to the north known as 585 Main Street that, at all relevant times, was owned by Vazhayil Babu. On January 13, 2011, the defendant filed with the office of the town clerk of Monroe a metes and bounds description of the boundaries of the portion of the property that it sought to have rezoned.

The commission commenced a public hearing on the defendant's application on February 17, 2011. At its outset, Attorney Kevin J. Gumpper raised a "point of order" with the commission, in which he alleged that

---

buildings and bearing the seal of a registered land surveyor, are filed by the applicant."

We further note that, in the land use context, the terms "special exception" and "special permit" have "the same meaning and can be used interchangeably." *Beckish* v. *Planning & Zoning Commission*, 162 Conn. 11, 15, 291 A.2d 208 (1971).

the notice of the proposed zone change filed by the defendant with the town clerk was inadequate.[5] A letter filed with the commission earlier in the day then was read into the record, in which Gumpper claimed that the notice failed to comply with § 8-3 (a) because it "refers to a compilation map which was not filed with the notice to the town clerk . . . ." Gumpper further argued that "[t]he boundaries of the proposed change must be described in the notice which is filed with the town clerk's office. It is not sufficient simply to refer in the notice to maps which are available elsewhere within the Town Hall." (Emphasis omitted.) Chairman Richard A. Zini, Jr., overruled that point of order.

The defendant then provided an initial presentation of its application, which included much discussion between commission members and the defendant's representatives regarding the details thereof. A public comment session followed, during which several residents opined that the proposed McDonald's restaurant was architecturally unappealing. Lee Hossler, a member of the Monroe Economic Development Commission, spoke in support of the application, noting that "this site is pretty much encased with [DB1 zoning] all around it—north and south. I think it would be instrumental to have this also [zoned as DB1]."

Gumpper spoke in opposition to the application. He reminded the commission that it possessed "very limited discretion when you act upon any special exception application. What you do is, you're looking to see that it complies with your regulations. . . . If it doesn't comply with your regulations you can't approve it." He then alerted the commission to two specific deficiencies in the defendant's application, alleging that the proposed parking area on the northern side of the property

---

[5] At that public hearing, Gumpper stated that "I am here tonight on behalf of Duchess of Monroe, which has an operation at 139 Main Street in Monroe." Gumpper represents the plaintiffs in this appeal.

violated the setback and landscaped buffer requirements of the DB1 zone. Specifically, Gumpper stated that the application failed to comply with the setback requirements contained in both §§ 117-1105 (B) and 117-1103 of the regulations because the defendant's proposal contained fourteen parking spaces located within thirty feet of property located in the RC zone.[6] In addition, Gumpper noted that § 117-1104, titled "Landscaping," provides in relevant part: "Landscaping shall be required as follows . . . B. All required yards abutting a residential and farming district shall be a landscaped buffer, as provided in Section 117-902 G." Section 117-902 G, in turn, provides that "[i]n [a] DB1 [zone] . . . a landscape buffer shall consist of no fewer than three (3) rows of suitable evergreen trees of one and one-half ($1\frac{1}{2}$) inches caliper . . . ." Although the property's northerly property line abuts properties located in the RC zone, the defendant's proposal did not contain such a landscape buffer.

Following the public comment session, the defendant's representative requested a continuance "to see if we can get authority to take into [consideration] the concerns" raised during the public comment session and to "try to implement . . . a more appropriate colonial look" to the building. The commission granted that request and continued the matter until March 17, 2011.

When the public hearing resumed on that date, the defendant began its presentation by opining that "the commission has the authority to waive or vary" the various requirements of the DB1 zone pursuant to §§ 117-1103 and 117-900 (E) of the regulations. Speaking on behalf of the defendant, Attorney Raymond Rizio

---

[6] Section 117-1105 (B) of the regulations provides in relevant part: "No parking areas or internal driveway shall be located . . . within thirty (30) feet of a residence district." Section 117-1103 of the regulations sets forth a minimum yard setback of thirty feet from a residential zone boundary and a minimum setback of twenty feet from "[a]ll other" abutting property lines.

explained that the original plan was filed with the understanding that the commission would exercise that authority. Given the concerns raised during the public hearing one month earlier, Rizio also submitted what he described as an "alternate plan that satisfies all the requirements" of the DB1 zone. As Rizio stated, that alternate plan "fully complies with regard to parking, setback and every standard that is set forth" in the regulations. He continued: "And all that happens is, basically, the parking shifts. . . . What we have done [is that in the original plan] there are fifty-eight parking spaces. The alternate plan has essentially the same circulation, the same queuing. Everything really is the same. What we've done is, we have eliminated parking spaces in this area, reduced that down . . . this provides a thirty foot bumper between the RC zone [to the north]. This map has forty-four parking spaces, which is the required minimum parking spaces based on [the] area of the building. Other than that, all the parking . . . is all the same . . . ." The alternate plan also reduced the width of the driveway around the building from eighteen to sixteen feet.[7] Rizio further indicated that, in the event that the commission declined to vary the landscaped buffer requirements, the defendant "would agree to do the same landscaping, the transitional landscaping," to comply fully with those requirements.

Rizio also informed the commission that Babu, the owner of the property abutting the northerly property line where the setback and landscaping issues arose, had no objections whatsoever to the defendant's plans. Rizio stated: "I [also] represent the owner [Babu] to the north and would like to represent for the record that he has no objection to the . . . proposed site plan

---

[7] As noted during the public hearing, sixteen feet is the minimum width permitted for such a driveway under the regulations.

or the alternate site plan." The chairman of the commission then clarified:

"Zini: So, you have [a] proxy to represent the property owner that—

"Rizio: I do represent him, yes.

"Zini: [Babu] does not have an issue with the waiver of the buffer?

"Rizio: Correct.

"Zini: Okay. So, let the record show."

Rizio also informed the commission that a zone change request for a portion of Babu's property from RC to DB1 "will be coming and a pending application will be coming" because his property "would never be used for residential purposes because [the property lacks] enough acreage [to comply with the residential regulations] . . . ."[8]

Rizio then explained that, in response to public feedback regarding architectural and aesthetic details, the defendant obtained approval from McDonald's for "a new plan, a colonial plan [with] new architecture [that]

---

[8] The record reveals that the eastern half of Babu's property was located in the DB1 zone and the western half, which abuts the portion of the defendant's property at issue in this appeal, was located in the RC zone.

In addition to the aforementioned testimonial evidence, the commission received a letter from Rizio that was marked as exhibit 32 by the commission at the March 17, 2011 proceeding. That letter stated in relevant part: "As part of the preparation for this application, a discussion took place between the [defendant] and the [Monroe] zoning office . . . prior to submission. In that discussion, it was believed that [Babu] would be submitting an application to the [c]ommission to rezone the westerly half of his property from RC to DB-1. To date that application has not been submitted, but [Babu] does intend to file such an application in the near future. Because of the contemplated zone change to [Babu's] property to the north and because the entire property to the north has historically been used as a commercial parcel, it was felt that this would be an appropriate instance when the commission could grant setback waivers to the landscaping and the parking area and driveway along [Babu's property] . . . ."

I think is something the commission will be very pleased with." Joseph Lombardi from McDonald's USA, LLC, spoke on behalf of the defendant, stating: "[L]ast time we visited with the community of Monroe there was some direction in how they would like to see McDonald's better fit in with the surrounding community, and it took us a while but upper management did approve us to move forward with a more colonial building . . . . [B]asically, what we have here is, we took the existing footprint of the building and added back on a single manson roof with basically dormers on every elevation, giving a pitched roof look, we have the clapboard siding, we added a stone [wainscoting] around the building, and also you see some stone around the drive-thru window . . . ." The defendant's representatives proceeded to discuss, inter alia, lighting upgrades and "a much more comprehensive landscape plan, including some stone walls" on the property. A public comment session followed, during which the commission heard both support for and opposition to the defendant's proposal. With respect to the redesigned building, public feedback was much more positive as compared to that at the February hearing.

The commission thereafter closed the public hearing and commenced its deliberations. Commission members first discussed the zone change request, noting that the proposed change was consistent with the town's plan of conservation and development and would result in an improved appearance overall. Zini also remarked that "it is within the commission's ability through planning and zoning to logically look at that re-use of existing resources to make a reasonable interpreted zone adjustment for the purposes of supporting the master plan and supporting the property owner at that location if it's not a feasible use in its current zone." Commission members further found that "[t]he zone change does not adversely affect public safety, health

and welfare." A motion to approve the defendant's request for a zone change from RC to DB1 passed unanimously by a vote of five to nothing.

The commission then turned its attention to the special exception request. Early in the deliberations, Commissioner Patrick O'Hara made a motion to grant a special exception pursuant to the alternate plan submitted by the defendant. Zini then interjected that "[t]he commission has to decide on the original plan, which waives the [setback and landscaping] buffer . . . [o]r we go with the plan that doesn't waive the buffer . . . . Well, let's save time—I'm going to put forward that the motion be revised to state that we go with the original plan and the commission consider waiving the buffer based on the surrounding properties—the surrounding considerations—the wetlands—and that the original . . . parking plan stay but [with] the new landscaping process . . . . I'm suggesting to stay with the original parking plan and the commission waives the buffer . . . . I state that in the fact that it will assist with traffic issues, and it will also create better use of the site because they are not going to have congested parking with the [drive-thru entrance]." O'Hara replied, "I'm fifty-fifty on which way to go—what you said is fine— I've basically—what I'm saying is, I've got a motion out here what everybody else wants to do—if everybody else wants to go back to the other . . . I'll change it." He then stated that "the question is, who wants . . . to forgive the buffer." The following colloquy ensued:

"[Commissioner Jane] Flader: . . . [W]hat's the logic of just going with the alternate plan?

"Zini: We uphold the buffer and there's less parking.

"Flader: Forty-four versus fifty-eight [parking spots].

"Zini: Uh-huh. It doesn't change the circulation—it does not change the building layout—it does not change the use of the property.

"[Commissioner Karen] Martin: Right—just means less pavement, less runoff.

"[Commissioner Michael J.] Parsell: I'd like to uphold the buffer, but I think it makes more sense.

"Zini: No—you're okay— I'm just saying that the difference is pretty basic, it's pavement, parking, and a little bit of landscape adjustment, doesn't change the site use as a whole.

"Flader: The architecture or anything like that. It's just basically—

"Zini: It doesn't touch the building, it affects the whole thing—and the main issue is the buffer—you have a property against you that we have a requirement to have a buffer against a residential property.

"Flader: So, you're not making spot changes based on—

"Zini: I'll remind the commission what was testified during the hearing—it was testified by the [defendant's] attorney that he represents the adjacent property owner who has, on the record, stated they have no issue with the dissolution of the buffer. So, you have the adjoining property owner making a legal statement in our record, which is similar to court proceedings, saying, I don't mind if my new future potential new neighbor dissolves the buffer—I can live with that. So, the commission either likes that or doesn't—we either support the buffer or we don't. And if you support the buffer, you reduce the parking . . . if you prefer the original plan, which decimates the buffer, then you allow more parking . . . .

"Parsell: I'd like to keep the buffer, but I think it makes more sense, especially after the winters like we have now . . . you have to take that into consideration,

too—snow removal and pushing around, so, I don't have a problem with the original, is what I'm getting to—

"Zini: Okay.

"O'Hara: You know what . . . I'm going to stop this and withdraw my motion.

"Zini: Okay. . . .

"[Commissioner Roger] Agaston: Well, one thing [is that the original plan] would provide a wider [driveway] . . . eighteen feet, so, I think that when you talk about these drive-thrus you're talking about a limited amount of these cars backing up in both directions—I would prefer to have the additional feet so that you're less likely to have cars colliding with one another. You also have the additional parking, [which], in my mind, means that people are less likely to park across the street and walk across the street with the added danger of people getting hit by trying to cross traffic, busy road . . . . I agree with [Parsell's] point about the difficulty we've had over the winter with the snow removal and at least have the additional space and . . . I think the reasons in favor of waiving the buffer made more sense than not . . . ."

By a vote of four to one, the commission thereafter approved a motion to grant the special exception pursuant to the original plan, though subject to the revised landscaping plan submitted by the defendant earlier in the evening.[9] Martin stated for the record that "the reason I voted no was because I would prefer [the alternate plan] for the buffer." At no point in its deliberations did the commission discuss the issue of whether it possessed the authority to waive or vary the setback and landscaping buffer requirements of the DB1 zone

---

[9] That revised landscaping plan did not include the buffer required by § 117-1104 of the regulations.

pursuant to §§ 117-1103 or 117-900 (E) of the regulations. In the "notice/certificate of decision" it subsequently issued on March 31, 2011, the commission listed the following "findings" on the special exception application: "1. The application is consistent with the [p]lan of [c]onservation and [d]evelopment . . . . 2. The application is consistent and in compliance with the [regulations]. 3. The [defendant] went through great effort to address the commission's concerns and to provide a development that will be pleasing to the [t]own."

The plaintiffs, all of whom are owners of property located within 100 feet of the defendant's property, filed a timely appeal of that decision with the Superior Court on April 8, 2011.[10] In their September 19, 2011 brief to the court, the plaintiffs raised two distinct claims. They first argued that the notice of the proposed zone change filed by the defendant with the town clerk did not comply with § 8-3 (a). The plaintiffs next claimed that "the commission did not have the authority to waive the parking area setback and the landscaped buffer requirement" set forth in §§ 117-1103, 117-1105 (B) and 117-1104 of the regulations. The plaintiffs' brief thus concluded that, "[b]ased on all of the foregoing, the purported waivers of the parking area setback and the landscaped buffer were invalid."

In its April 2, 2012 memorandum of decision, the court first found that the plaintiffs possessed standing to pursue the appeal. The court also found that the notice of the proposed zone change filed by the defendant with the town clerk complied with the requirements of § 8-3 (a). The court next reviewed the regulations regarding design districts in Monroe and

---

[10] "[P]ursuant to General Statutes § 8-8 (a), a person may derive standing to appeal based solely upon his status as an abutting landowner or as a landowner within 100 feet of the subject property." *Pierce* v. *Zoning Board of Appeals*, 7 Conn. App. 632, 635–36, 509 A.2d 1085 (1986).

determined that the commission "sits in a legislative capacity when acting upon a design district application." As such, the court concluded that the commission's decision to grant the special exception and approve the site plan was a proper exercise of its discretion thereunder. The court then noted that "even when measured against the more rigorous standard of administrative review, applicable to a traditional special permit application, the decision of the commission approving the development plan is supported by substantial evidence and must be upheld. The record, including extensive commission discussion, fully supports a finding that the standards applicable to a DB1 zone were followed, except for 'minor variations,' which the commission was authorized to approve." Accordingly, the court dismissed the plaintiffs' appeal.

The plaintiffs thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o). We granted the petition and this appeal followed.

I

The plaintiffs' principal claim centers on the commission's decision to vary certain requirements of the DB1 zone. More specifically, they allege that the granting of the special exception was improper because the site plan presented by the defendant did not comply with the setback and the landscaped buffer requirements contained in §§ 117-1103, 117-1104 (B) and 117-1105 (B) of the regulations. Distilled to its essence, the plaintiffs' claim is that the commission lacked the authority to vary those requirements.

A

The defendant argues, as a threshold matter, that the plaintiffs' claim is moot due to circumstances that arose during the pendency of this appeal. "It is a well-settled general rule that the existence of an actual controversy

is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . Mootness applies to situations where events have occurred during the pendency of an appeal that make an appellate court incapable of granting practical relief through a disposition on the merits. . . . Because [an appellate] court has no jurisdiction to give advisory opinions, no appeal can be decided on its merits in the absence of an actual controversy for which judicial relief can be granted. . . . The test for determining mootness of an appeal is whether there is any practical relief [the appellate] court can grant the appellant. . . . If no practical relief can be afforded to the parties, the appeal must be dismissed." (Citation omitted; internal quotation marks omitted.) *Urbanowicz* v. *Planning & Zoning Commission*, 87 Conn. App. 277, 291–92, 865 A.2d 474 (2005). "Whether an action is moot implicates a court's subject matter jurisdiction and is therefore a question of law over which we exercise plenary review." (Internal quotation marks omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, 301 Conn. 323, 332, 21 A.3d 737 (2011).

Appended to the defendant's appellate brief is a copy of a "notice/certificate of decision" issued by the commission in 2012, regarding Babu's abutting property. That notice, filed in volume 1769, page 099, of the Monroe land records on November 14, 2012, states that the commission approved a zone change from RC to DB1 for the "rear portion" of Babu's property. In light of that development, the defendant argues that the plaintiffs' challenge to the granting of the special exception has become moot.

A necessary prerequisite to application of the parking setback and landscaped buffer requirements of §§ 117-1105 (B) and 117-1104 (B) is the presence of an abutting

property that is in a residential zone. The parking restriction contained in § 117-1105 (B) of the regulations provides in relevant part that "[n]o parking areas or internal driveway shall be located . . . within thirty (30) feet *of a residence district*." (Emphasis added.) The landscaped buffer requirement set forth in § 117-1104 (B) likewise requires that "[a]ll required yards *abutting a residential and farming district* shall be a landscaped buffer . . . ." (Emphasis added.) Those requirements plainly do not apply to abutting properties in a commercial or design district, such as DB1. As a result, the defendant contends that this court cannot provide the plaintiffs with any practical relief in the event that we were to sustain their appeal, as those regulatory requirements would be irrelevant to the commission's consideration of an identical special exception application in the future.

The plaintiffs briefed the mootness issue in their reply brief. Their response is twofold. First, they argue that this court cannot determine that the issue is moot because it necessarily would require fact-finding on our part. The plaintiffs do not dispute the fact that Babu filed on the Monroe land records a notice of decision granting a zone change on his abutting property to DB1, nor did they seek to have stricken from the defendant's brief a copy of that filing. See Practice Book § 60-2 (court may "upon motion of any party . . . (3) order improper matter stricken from the record or from a brief or appendix"). They nevertheless assert that we cannot conclude that the matter is moot because "[t]here has been no finding by the trial court that this [zone change] in fact has occurred" and thus maintain that the case must be remanded to the Superior Court for a resolution of the factual issues necessary to address the mootness issue. We disagree.

This is not a case in which this court is presented with an allegation of fact that is contested by the opposing party. The defendant has provided this court with

a copy of the "notice/certificate of decision" issued by the commission that granted the zone change on Babu's abutting property from RC to DB1, which document is stamped, "I hereby certify that this is a true copy of the original document received for record in the office of the town clerk of the town of Monroe, CT," and is signed by "Theresa A. DiGiovanna, Asst Town Clerk." The plaintiffs do not dispute the veracity of that document or its contents. As such, the present case is akin to those in which analysis of a mootness question is aided by a factual concession or stipulation of the parties. See, e.g., *Darien* v. *Estate of D'Addario*, 258 Conn. 663, 677 n.15, 784 A.2d 337 (2001) (appellate court "is certainly capable of determining, particularly when the facts are undisputed, whether the case is now moot as a result of the events that transpired while the appeal was pending"); *Ayala* v. *Smith*, 236 Conn. 89, 94, 671 A.2d 345 (1996) (noting that "[t]he determination of whether a claim has become moot is fact sensitive, and may include the representations made by the parties at oral argument" and deciding mootness question on basis of such representation); *Paupack Development Corp.* v. *Conservation Commission*, 229 Conn. 247, 249 n.2, 640 A.2d 70 (1994) ("[a]s it is undisputed" that commission amended regulations during pendency of appeal to conform with requirements of state law, challenge to outdated regulations moot). *Morgan* v. *Morgan*, 139 Conn. App. 808, 811–12, 57 A.3d 790 (2012) (deciding mootness question on basis of fact not disputed by parties on appeal). This court, therefore, may determine whether the rezoning of Babu's property from RC to DB1 renders the plaintiffs' challenge moot.

The plaintiffs also argue that, despite that development, this court can grant them practical relief. They claim that even if the landscaped buffer requirement of § 117-1104 (B) and the parking restriction of § 117-1105 (B) are rendered inapplicable by the zone change

on Babu's property, a setback intrusion remains, as the proposed parking area continues to violate the minimum yard setback contained in § 117-1103 of the regulations. Even with Babu's abutting property rezoned as DB1, the plaintiffs emphasize that § 117-1103 specifies a minimum yard setback of twenty feet.[11] The "schematic site plan" prepared by the engineering firm of Spath-Bjorklund Associates, Inc., and submitted by the defendant at the public hearing, depicts a measurement of approximately three to six feet between the boundary of Babu's abutting property to the north and the parking spaces in question. As a result, the plaintiffs contend that, were this court to sustain their appeal, they could pursue a challenge to the proposed parking area before the commission should a revised application follow. We agree and conclude that practical relief can be afforded to the plaintiffs. Their challenge to the setback and landscaped buffer requirements, therefore, is not moot.

B

We thus return to the question of whether the commission properly was empowered to vary those requirements in the present case. The defendant submits that §§ 117-1103 and 117-900 (E) of the regulations expressly authorize the commission, in granting a special exception, to vary, inter alia, the setback and landscaped buffer requirements. The defendant further contends that the commission's decision to vary those requirements fell within the reasonable degree of discretion afforded to it when acting in its legislative capacity. We do not agree.

1

The defendant claims that the regulations confer on the commission the power to vary or waive the applicable regulatory requirements "on a case-by-case basis"

---

[11] Section 117-1103 sets forth minimum yard setbacks of thirty feet from a "residential or farm zone boundary" or an "easement or right-of-way," and a minimum setback of twenty feet for "[a]ll other."

in acting on a special exception request for properties located in a design business district. Analysis of that claim entails "construction of the relevant regulations and statutes, and is therefore a matter of law over which we exercise plenary review . . . ." *Zimnoch* v. *Planning & Zoning Commission*, 302 Conn. 535, 547, 29 A.3d 898 (2011).

i

Section 117-1103 of the regulations sets forth the dimensional requirements applicable to design business districts, including DB1. Prior to listing a detailed "Schedule of [d]imensional [r]equirements," that regulation provides in relevant part: "[N]o lot shall be used and no building shall be constructed or altered for use for business purposes except in conformance with the following schedule; provided, however, that the [c]ommission may modify lot area, frontage, minimum square and yard requirements where applied to a lot under separate ownership of record on the effective date of these regulations, so long as there is adequate provision for sewage disposal and water supply and so long as access to public streets will not create traffic hazard. . . ." Section 117-900 likewise sets forth certain "general requirements [that] shall apply to uses and improvements in all design districts . . . (E) Where deemed appropriate in the judgment of the [c]ommission in a specific application, a site plan of development in substantial compliance with the requirements herein may be approved with such minor variations from the strict application of the provisions of these regulations as will provide for the most appropriate use of land and as will protect the public health and safety and preserve property values and as will provide for the most orderly development of land. No variations shall be permitted that violate the integrity of these regulations or that will change the principal classification of

permitted land uses. . . ."[12] The issue before us is whether those provisions are proper.

To determine whether those regulations were within the authority of the commission to enact, "we must search for statutory authority for the enactment." *Avonside, Inc.* v. *Zoning & Planning Commission*, 153 Conn. 232, 236, 215 A.2d 409 (1965). "Administrative agencies [such as the commission] are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves. . . . [It] is clear that an administrative body must act strictly within its statutory authority . . . ." (Internal quotation marks omitted.) *Keiser* v. *Zoning Commission*, 72 Conn. App. 721, 729, 806 A.2d 103, cert. denied, 262 Conn. 909, 810 A.2d 274 (2002); see also *Eden* v. *Town Plan & Zoning Commission*, 139 Conn. 59, 63, 89 A.2d 746 (1952) ("zoning authorities can only exercise such power as has been validly conferred upon them by the General Assembly" [internal quotation marks omitted]). "No administrative or regulatory body can modify, abridge or otherwise change the statutory provisions under which it acquires authority unless the statute specifically grants it that power." (Internal quotation marks omitted.) *Finn* v. *Planning & Zoning Commission*, 156 Conn. 540, 546, 244 A.2d 391 (1968).

In *Langer* v. *Planning & Zoning Commission*, 163 Conn. 453, 313 A.2d 44 (1972), our Supreme Court confronted the question of whether a commission was

---

[12] The regulations do not define or specify what constitutes a "minor variation." Whether the variance of a setback requirement properly may be considered "minor" is a question we need not resolve in this appeal. Cf. *Rogers* v. *Zoning Board of Appeals*, 154 Conn. 484, 487, 227 A.2d 91 (1967) ("[t]he obvious purpose of yard requirements and setback lines is to prevent fire hazards, provide for proper drainage and make suitable provision for light and air").

within its authority to enact regulations that vested the commission with the power to vary the requirements of a specific district on a case-by-case basis. The planning and zoning commission in that case created a "restricted professional office district" (RPOD) subject to regulatory restrictions "on use, setback, height, minimum floor area, ground coverage, parking, architectural design, site plan, signs, changes of use, expansion and reconstruction of buildings." Id., 454–55. Section 4B.8.4 of the RPOD regulations provided that "[t]he Planning and Zoning Commission, on written request from the applicant, may modify, vary, waive or accept other uses as set forth in the above paragraph in harmony with the general purpose and intent of these Regulations, where the effect thereof is arbitrary, or where a literal enforcement of the Regulations would result in practical difficulties not required to accomplish the purpose of a professional office district, so that substantial justice will be done and the general purpose and intent of these Regulations will be accomplished." (Internal quotation marks omitted.) Id., 457.

The plaintiffs claimed that this regulation was invalid "in that it violates General Statutes § 8-6 which vests the power to vary the application of zoning ordinances exclusively in a board of appeals." Id. The Supreme Court agreed, stating: "An examination of the provisions of chapter 124 of the General Statutes, especially [General Statutes] § 8-2,[13] concerning the power conferred on the defendant planning and zoning commission, and

---

[13] General Statutes § 8-2 "explicitly enables the use of special exceptions." (Internal quotation marks omitted.) *Smith Bros. Woodland Management, LLC* v. *Planning & Zoning Commission*, 88 Conn. App. 79, 82, 868 A.2d 749 (2005). That statute provides in relevant part: "All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district . . . and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission . . . subject to standards set forth in the regulations . . . ." General Statutes § 8-2 (a).

§ 8-6, concerning the powers of boards of appeal, can lead only to the conclusion that the power to vary the ordinance to accommodate practical difficulties and do substantial justice lies exclusively in a board of appeals. In connection with zoning ordinances, it is a cardinal principle of construction that provisions and amendments must be enacted pursuant to the zoning enabling statute. . . . Because § 4B.8.4 allows the commission to vary uses on an application-to-application basis to a degree that they are different from those uniformly allowed under § 4B.8.1, § 4B.8.4 is beyond the scope of the planning and zoning commission's authority and is, therefore, invalid and void." (Citations omitted.) Id., 457–58; accord R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 22:16, pp. 677–78 ("[i]t is illegal for the zoning commission to vary uses on an application to application basis, and the exclusive authority to vary the zoning regulations is vested in the zoning board of appeals"); T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) p. 123 ("[n]o municipal agency other than the board of appeals may be given the power to vary the application of the zoning regulations in individual cases"); 7 N. Williams, American Land Planning Law (2d Ed. 2003) § 139, p. 27 ("the power to issue variances is specifically granted to zoning boards in the enabling statutes"). That logic applies with equal force here. To paraphrase Justice Ryan's observation in *South East Property Owners & Residents Assn.* v. *City Plan Commission*, 156 Conn. 587, 591, 244 A.2d 394 (1968), there is nothing contained within the General Statutes authorizing the commission to adopt regulations empowering itself to vary the application of the regulations when acting on a special exception request.

The proposition that §§ 117-1103 and 117-900 (E) of the regulations properly vest in the commission the power to vary the requirements of the DB1 zone on a

"case-by-case basis" reflects a fundamental misunderstanding of the role of the variance power within a municipality. "The variance power exists to permit what is prohibited in a particular zone."[14] *Adolphson* v. *Zoning Board of Appeals*, 205 Conn. 703, 710, 535 A.2d 799 (1988). In simple terms, the zoning commission acts as a land use legislature in enacting zoning requirements. See *Arnold Bernhard & Co.* v. *Planning & Zoning Commission*, 194 Conn. 152, 164, 479 A.2d 801 (1984). By contrast, "the zoning board of appeals is the court of equity of the zoning process . . . ." 9 R. Fuller, supra, § 9:1, pp. 237–38.

Every municipality which exercises the zoning power is mandated by General Statutes § 8-5 to have a zoning board of appeals, which acts as a "quasi-judicial" body; *Nielsen* v. *Zoning Board of Appeals*, 152 Conn. 120, 123, 203 A.2d 606 (1964); in deciding whether to grant "relief from the literal enforcement of a zoning ordinance . . . ."[15] (Internal quotation marks omitted.) *L & G Associates, Inc.* v. *Zoning Board of Appeals*, 40 Conn. App. 784, 788, 673 A.2d 1146 (1996). As our Supreme Court explained more than one-half century ago, "[a zoning] board of appeals is indispensable to the zoning process both from the constitutional and the practical standpoint. . . . In creating building zones and in adopting pertinent zoning regulations, zoning commissions are required to deal with established and growing communities. . . . It is inevitable that a zoning regulation permitting certain uses of land and proscribing others will adversely affect individual rights in some cases. The essential purpose of a board of appeals is

[14] Indeed, the defendant in the present case obtained a variance from the Monroe Zoning Board of Appeals to permit a drive-thru window, which otherwise is prohibited under § 117-1101 (A) (5) of the regulations, prior to applying for the zone change and special exception at issue in this appeal.

[15] "A variance of the zoning regulations requires a variance application to the zoning board of appeals. The zoning commission itself cannot vary the requirements of the special permit or site plan provisions of the zoning regulations." 9 R. Fuller, supra, § 15:15, p. 489.

to deal with these cases by furnishing elasticity in the application of regulatory measures so that they do not operate in an arbitrary or confiscatory, and consequently unconstitutional, manner. . . . We must remember that the machinery of government would not work if it were not allowed a little play in its joints. . . . The purpose of boards of appeal . . . is to keep the law running on an even keel." (Citations omitted; internal quotation marks omitted.) *Florentine* v. *Darien*, 142 Conn. 415, 425–26, 115 A.2d 328 (1955); accord 4 P. Salkin, American Law of Zoning (5th Ed. 2008) § 39:7, p. 39-26 (zoning board of appeals "created to interpret, to perfect, and to insure the validity of zoning"). Thus, zoning commissions and zoning boards of appeal are, by design and by statute, independent branches of a municipality's land use department.[16] Tellingly, the defendant has not presented this court with any precedent, nor have we discovered any, in which a zoning commission's decision to wield the variance power on a case-by-case basis within a given district has been upheld, outside the narrow confines of General Statutes § 8-26.[17] Contra *Langer* v. *Planning & Zoning Commission*, supra, 163 Conn. 457–58.

---

[16] We note that members of the zoning commission are forbidden from concurrently serving on the zoning board of appeals in a given municipality. General Statutes § 8-5.

[17] General Statutes § 8-26 (a) provides in relevant part: "The commission shall have the authority to determine whether the existing division of any land constitutes a subdivision or resubdivision under the provisions of this chapter, provided nothing in this section shall be deemed to authorize the commission to approve any such subdivision or resubdivision which conflicts with applicable zoning regulations. Such regulations may contain provisions whereby the commission may waive certain requirements under the regulations by a three-quarters vote of all the members of the commission in cases where conditions exist which affect the subject land and are not generally applicable to other land in the area, provided that the regulations shall specify the conditions under which a waiver may be considered and shall provide that no waiver shall be granted that would have a significant adverse effect on adjacent property or on public health and safety. . . ."

That enabling statute "grants municipal zoning commissions the authority to approve a waiver of their regulations in appropriate circumstances" when

ii

In addition, application of the variance power set forth in §§ 117-1103 and 117-900 (E) runs afoul of the uniformity requirement of General Statutes § 8-2.[18] That statutory imperative "requires *intradistrict* uniformity, and not uniformity among all districts in a given town . . . ." (Citation omitted; emphasis in original.) *Pleasant Valley Neighborhood Assn.* v. *Planning & Zoning Commission*, 15 Conn. App. 110, 114, 543 A.2d 296 (1988). As the Supreme Court has explained, "[t]he obvious purpose of the requirement of uniformity in the regulations is to assure property owners that there shall be no improper discrimination, all owners of the same class and in the same district being treated alike with provision for relief in cases of exceptional difficulty or unusual hardship by action of the zoning board of appeals." *Veseskis* v. *Bristol Zoning Commission*, 168 Conn. 358, 360, 362 A.2d 538 (1975); see also *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 147, 653 A.2d 798 (1995) (uniformity requirement "serves the interests of providing fair notice to applicants and of ensuring their equal treatment"); *Smith Bros. Woodland Management, LLC* v. *Planning & Zoning Commission*, 88 Conn. App. 79, 83–84, 868 A.2d 749 (2005) (uniformity requirement "represents a compromise between the relative inflexible structure of Euclidian zoning and the impermissible favoritism, corruption and violations of

approving a subdivision plan. *Shailer* v. *Planning & Zoning Commission*, 26 Conn. App. 17, 21–22, 596 A.2d 1336 (1991).

[18] General Statutes § 8-2 (a) provides in relevant part: "The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes . . . . All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district . . . ."

the uniformity requirement that could stem from a pure case-by-case approach" [internal quotation marks omitted]); 1 N. Williams, American Land Planning Law (2d Ed. 2003) § 32:1, p. 827 (uniformity requirement "represents a reenactment in statutory form of the general principle underlying the equal protection clause—that all land in similar circumstances should be zoned alike").

The uniformity requirement thus precludes case-by-case variance of regulatory requirements by the zoning commission in a given district. For example, in *Veseskis* v. *Bristol Zoning Commission*, supra, 168 Conn. 359, the zoning commission changed the zone of two adjoining parcels of land from "residence B zone to residence C zone" and created "a 200-foot buffer zone on [only] the easterly side of this [district]." In sustaining the plaintiffs' appeal therefrom, the court reasoned that "[t]o require by zoning regulation a buffer strip between one zone of a particular classification and another zone of a different class in one specific instance and not in other instances when zones of these two zone classifications abut clearly violates the statutory uniformity requirement and is exactly the arbitrary and discriminatory use of the police power which the statute was designed to prevent." Id., 360. In light of the uniformity requirement of § 8-2, the court held that the zoning commission "did not have the power or authority . . . to create a special buffer strip on one specific individual piece of property by an amendment to its zoning regulations." Id., 361; see also *Bartsch* v. *Planning & Zoning Commission*, 6 Conn. App. 686, 689–91, 506 A.2d 1093 (1986) (uniformity requirement prohibited commission from attaching condition to granting of zone change and special permit requiring fifty foot green belt buffer area). By contrast, when a zoning commission acts to "insure consistency of application"; *Pleasant Valley Neighborhood Assn.* v. *Planning & Zoning Commission*, supra, 15 Conn. App. 116; of a buffer requirement

throughout a district, it provides "a sufficient guaranty of intradistrict uniformity [and] satisfies the requirement of General Statutes § 8-2." Id., 115. In "waiving" the landscaped buffer requirement set forth in § 117-1104 (B) of the regulations, the commission in the present case contravened that statutory requirement. Its decision to vary the setback requirements of §§ 117-1103 and 117-1105 (B) of the regulations likewise constitutes an inconsistent application of the requirements within the DB1 zone.[19]

The defendant nevertheless analogizes the design business districts in Monroe to floating zones and planned development districts, which, as the Superior Court noted, are recognized as legitimate land use tools.[20] See *Campion* v. *Board of Aldermen*, 278 Conn. 500, 899 A.2d 542 (2006); *Blakeman* v. *Planning & Zoning Commission*, 82 Conn. App. 632, 846 A.2d 950,

---

[19] Varying a setback requirement is a quintessential function of the zoning board of appeals. See, e.g., *Wright* v. *Zoning Board of Appeals*, 174 Conn. 488, 391 A.2d 146 (1978); *Burlington* v. *Jencik*, 168 Conn. 506, 362 A.2d 1338 (1975); *Stancuna* v. *Zoning Board of Appeals*, 66 Conn. App. 565, 785 A.2d 601 (2001).

[20] "A floating zone is a special detailed use district of undetermined location in which the proposed kind, size and form of structures must be preapproved. It is legislatively predeemed compatible with the area in which it eventually locates if specified standards are met and the particular application is not unreasonable. . . . It differs from the traditional Euclidean zone in that it has no defined boundaries and is said to float over the entire area where it may eventually be established. . . . The legality of this type of zoning, when properly applied, has been recognized by this court." (Citations omitted; internal quotation marks omitted.) *Schwartz* v. *Town Plan & Zoning Commission*, 168 Conn. 20, 22, 357 A.2d 495 (1975). "[A] floating zone is approved in two discrete steps—first, the zone is created in the form of a text amendment, but without connection to a particular parcel of property—and second, the zone is later landed on a particular property through a zoning map amendment. In short, with respect to floating zones, development plans for specific properties within a district are approved separately from the zoning map amendment. Planned development districts . . . however, combine into a single step the approval of a zoning map amendment and a general development plan for the district." *Campion* v. *Board of Aldermen*, 278 Conn. 500, 518, 899 A.2d 542 (2006).

cert. denied, 270 Conn. 905, 853 A.2d 521 (2004). The defendant thus posits that, as instruments designed to promote flexibility, the commission should, as part of its approval of a special exception, filed in connection with a design district zone change request, be permitted to vary the regulatory requirements pursuant to §§ 117-1103 and 117-900 (E). For two critical reasons, the defendant is mistaken.

First and foremost, as the Supreme Court recognized in *Campion*—a case on which the defendant principally relies—floating zones and planned development districts are bound by the uniformity requirement. The court held that the planned development district at issue in that case satisfied the uniformity requirement "because once the new zoning district is created, the planned development district only incorporates characteristics that are consistent with the new district's regulations." *Campion* v. *Board of Aldermen*, supra, 278 Conn. 524. Put differently, that planned development district did not vary the applicable regulations within the district.

Second, the defendant's argument misunderstands a crucial distinction between floating zones and special exceptions. "[W]hile the concept of a floating zone is similar to the established power of a zoning board to grant special exceptions, the two types of regulation may be distinguished. . . . [I]f a landowner meets the conditions set forth for a special exception, the board is bound to grant one, but in the case of a floating zone discretion is maintained and *additional* limitations may be imposed—*more* control is retained by the zoning board because it is acting legislatively." (Emphasis added; internal quotation marks omitted.) *Homart Development Co.* v. *Planning & Zoning Commission*, 26 Conn. App. 212, 215–16, 600 A.2d 13 (1991). Thus, the flexibility inherent in a floating zone stems from the commission's ability to impose *greater* restrictions

on a property contained therein beyond the minimum requirements set forth in the regulations.[21] The defendant would have us turn this precept on its head, thereby granting a commission the power, in acting on such a special exception application, not only to impose greater restrictions on a parcel, but also to vary or waive existing restrictions—such as minimum setback and landscaped buffer requirements—applicable to all other properties within the district in contravention of the uniformity rule. We decline that invitation.

2

The defendant also contends that the commission's decision to vary the setback and landscaped buffer requirements fell within the reasonable discretion afforded to it when acting in a legislative capacity. In dismissing the plaintiffs' appeal, the Superior Court determined that the commission acted in a legislative capacity in granting the special exception. The plaintiffs contend that the court applied an improper standard. "[W]hether the court applied the correct legal standard is a question of law subject to plenary review." *Wieselman* v. *Hoeniger*, 103 Conn. App. 591, 598, 930 A.2d 768, cert. denied, 284 Conn. 930, 934 A.2d 245 (2007).

Preliminarily, we note that the parties agree that the commission generally acts in its legislative capacity when granting a zone change and acts in its administrative capacity when granting a special exception or permit. See *Konigsberg* v. *Board of Aldermen*, 283 Conn.

---

[21] In that regard, a commission's ability to exceed the minimum requirements set forth in the regulations vaguely resembles the ability of a state constitution to exceed, but not diminish, the "floor" of constitutional guarantees set forth in its federal counterpart. See *Traylor* v. *State*, 596 So. 2d 957, 962 (Fla. 1992) ("[i]n any given state, the federal [c]onstitution . . . represents the floor for basic freedoms; the state constitution, the ceiling"); cf. *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 250 n.16, 662 A.2d 1179 (1995) ("Waste Management argues that we must not interpret our state constitution to provide less protection for property owners than the 'floor' established by the federal constitution").

553, 581, 930 A.2d 1 (2007) (a "zoning change [is considered a decision] of the [commission] acting in its legislative capacity"); *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 627, 711 A.2d 675 (1998) (when ruling on application for special permit, planning and zoning commission acts in administrative capacity). As our Supreme Court explained, "[i]n traditional zoning appeals, the scope of judicial review depends on whether the zoning commission has acted in its legislative or administrative capacity. The discretion of a legislative body, because of its constituted role as formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function. . . . Acting in such legislative capacity, the local [zoning] board is free to amend [or to refuse to amend] its regulations whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for [or the undesirability of] a change. . . . Zoning must be sufficiently flexible to meet the demands of increased population and evolutionary changes in such fields as architecture, transportation, and redevelopment. . . . The responsibility for meeting these demands rests, under our law, with the reasoned discretion of each municipality acting through its duly authorized zoning commission. . . . In contrast, when acting in an administrative capacity, a zoning commission's more limited function is to determine whether the applicant's proposed use is one which satisfies the standards set forth in the [existing] regulations and the statutes. . . . In fulfilling its administrative function, a zoning commission is less concerned with the development of public policy than with the correct application of law to facts in the particular case." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 150–51.

The plaintiffs maintain that the commission's decisions to approve the zone change and to grant the special exception are distinct acts. They reason that the commission exercised its legislative authority in approving the zone change of the defendant's property from RC to DB1, but acted in its administrative capacity in granting the special exception request. Because that request did not comply with the setback and landscaped buffer requirements, as the defendant concedes and the Superior Court in its memorandum of decision found, the plaintiffs claim that their appeal must be sustained.

The defendant, by contrast, submits that the commission, in entertaining an application for a zone change to a design district accompanied by a request for a special exception, acts in a legislative capacity in reviewing the special exception request. As such, it argues that the commission possesses the discretion to vary the applicable regulatory requirements within the district "on a case-by-case basis . . . ." We disagree.

Our Supreme Court addressed a similar scenario in *Weigel* v. *Planning & Zoning Commission*, 160 Conn. 239, 278 A.2d 766 (1971). The defendants in that case simultaneously applied to the Westport Planning and Zoning Commission for a zone change from a residential district to a "design development district" and for a special permit to allow a particular establishment on the property in question. Id., 241. Following a public hearing, the commission approved those requests. The plaintiffs appealed from those decisions to the Court of Common Pleas, which dismissed their appeals. Id.

On appeal before the Supreme Court, the plaintiffs challenged the propriety of the commission's decisions granting both the zone change and the special permit. The court first addressed the rezoning of the subject property and applied the familiar standard applicable to decisions made by the commission in its legislative

capacity. Id., 241–43. It stated: "The circumstances and conditions in matters of zone changes and regulations are peculiarly within the knowledge of the zoning commission. Where it appears that an honest judgment has been reasonably and fairly exercised after a full hearing, courts should be cautious about disturbing the decision of the local authority. . . . The facts before the commission were such as to support, fairly and reasonably, its conclusion that the change of zone applied for would permit the use of the land for a purpose which was suitable and appropriate and would create a new zone which was in keeping with the orderly development of the comprehensive plan for the zoning of the entire town. . . . The conclusion of the trial court that the change of zone did not violate the comprehensive plan of the town of Westport was correct." (Citations omitted.) Id., 242–43.

The court then turned its attention to the plaintiffs' "claim that the commission had no authority to grant the special permit because it was in violation of the Westport zoning regulations." Id., 244. In analyzing that claim, the court first set forth the well established standard governing a commission's decision to grant a special permit in its administrative capacity, noting that "[t]o justify the grant of the special permit, it must appear from the record before the commission that the manner in which the applicant proposes to use his property satisfies all conditions imposed by the regulations." Id., 246; accord *Torrington* v. *Zoning Commission*, 261 Conn. 759, 777, 806 A.2d 1020 (2002) (*Vertefeuille, J.*, dissenting) ("[i]t is axiomatic that a special permit application and site plan must conform to the standards set out in the regulations . . . and if a special permit does not comply with the applicable regulations, the commission cannot approve it" [citation omitted]); *Farina* v. *Zoning Board of Appeals*, 157 Conn. 420, 422, 254 A.2d 492 (1969) ("[i]n granting the

special exception, the [agency] was acting in an administrative capacity, and its function was to determine whether the applicant's proposal satisfied the conditions set forth in the zoning regulations"); 9A R. Fuller, supra, § 33:4, p. 246 ("[f]or a special permit to be granted it must appear from the record before the agency that the application met all conditions imposed by the regulations"). Because "[t]he uses authorized by the special permit [did] not comply with the Westport zoning regulations," the Supreme Court held that the commission improperly granted the special permit. *Weigel* v. *Planning & Zoning Commission*, supra, 160 Conn. 246–47. For that reason, the court concluded that "[t]here is no error in the conclusion of the trial court dismissing the plaintiffs' appeal from the granting of the change of zone by the defendant commission. There is error in the action of the trial court dismissing the plaintiffs' appeal from the granting by the defendant commission of a special permit." Id., 249.

Consistent with *Weigel* and with particular respect to combined applications for a design district zone change and special exception under the regulations in Monroe, our Supreme Court has noted that "the considerations and actions taken by the commission in reviewing the zone change application are slightly different in operation when compared to the special exception permit application . . . ." (Footnote omitted.) *Zimnoch* v. *Planning & Zoning Commission*, supra, 302 Conn. 552. Largely replicating the standards enunciated in *Weigel*, the court stated: "In particular, a 'zoning change . . . [is considered a decision] of the [commission] acting in its legislative capacity.' *Konigsberg* v. *Board of Aldermen*, [supra, 283 Conn. 581]; see also 9A R. Fuller, supra, § 33:2, p. 233 ('[a] zoning commission, when amending zoning regulations or passing a zone change, acts in a legislative capacity'). This is in contrast to 'a special permit, or special exception, the granting of which is an

administrative function' of the commission. *Heithaus* v. *Planning & Zoning Commission*, 258 Conn. 205, 215, 779 A.2d 750 (2001); see also 9A R. Fuller, supra, § 33:3, p. 240 ('[w]here a special permit [or special exception] is involved, the action is administrative in nature')." *Zimnoch* v. *Planning & Zoning Commission*, supra, 552 n.18. One noted commentator likewise emphasized that distinction in combined applications: "The [Supreme] Court has approved scenarios where in the same executive session the zoning commission has first changed the zone . . . and then approved the special permit. This two-step procedure has several advantages for the municipality. The zone change is a legislative decision, and as such is subject to the most minimal judicial review. Having established the subject of the conditions that may be imposed on the special permit and the criteria for issuing the permit in this nearly unreviewable regulation, the commission puts on its administrative hat to consider the special permit application." T. Tondro, supra, pp. 191–92.

We further are mindful that "[i]n numerous cases we have held that the function of creating zones and adopting regulations is essentially legislative." *Wasicki* v. *Zoning Board*, 163 Conn. 166, 171, 302 A.2d 276 (1972). For that reason, a commission's decision to enact a floating zone or planned development district is legislative in nature. *Campion* v. *Board of Aldermen*, supra, 278 Conn. 526 ("the approval of a planned development district creates a new zoning district, and like any other adoption of a new zone, is legislative in nature"); *Sheridan* v. *Planning Board*, 159 Conn. 1, 16, 266 A.2d 396 (1969) ("the floating zone is the product of legislative action"). As the plaintiffs persuasively argue, the critical difference between floating zones and planned development districts on the one hand, and design districts such as DB1 on the other, is the fact that in the latter "the regulations themselves were not

changed and no new zoning district was established."[22] As the Supreme Court explained in great detail in *Campion* v. *Board of Aldermen,* supra, 517–19, both floating zones and planned development districts entail amendment of zoning regulations and the creation of a new zoning district. In varying the setback and landscaped buffer requirements as part of its special exception approval, the commission here neither created a new zoning district nor amended the zoning regulations. Put simply, the commission did not legislate in acting on the defendant's special exception application.

The aforementioned precedent persuades us that the commission acted in its administrative capacity in granting the defendant's special exception request. Accordingly, the commission's decision must be evaluated pursuant to that legal standard.

C

"A special [exception] allows a property owner to use his property in a manner expressly permitted by the local zoning regulations. . . . The proposed use . . . must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience, and property values. . . . Acting in this administrative capacity, the [zoning commission's] function is to determine whether the applicant's proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and the statute are satisfied." (Internal quotation marks omitted.) *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission,* 46 Conn. App. 566, 569, 700 A.2d 67, cert. denied, 243 Conn. 935, 702 A.2d 640 (1997).

"It is well settled that in granting a special [exception], an applicant must satisf[y] all conditions imposed

---

[22] In its appellate brief, the defendant acknowledges that "no 'new' regulations are adopted as part of the design district rezoning process . . . ."

by the regulations." (Internal quotation marks omitted.) Id. As the Superior Court noted, "[t]he site plan initially presented to [and ultimately approved by] the commission did not fully comply with the parking, landscaping and buffer requirements in the regulations."[23] At no point has the defendant disputed that determination. Rather, it acknowledged as much in submitting an alternate plan before the commission. Because the plan approved by the commission plainly does not comply with the setback and landscaped buffer requirements contained in §§ 117-1103, 117-1104 (B) and 117-1105 (B) of the regulations, the commission's decision to approve the special exception was improper. Accordingly, we reverse in part the judgment of the Superior Court and remand the matter with direction to sustain this part of the plaintiff's appeal. Our conclusion in this regard does not affect the validity of the zone change, which "is clearly severable" from the special exception issue. *Weigel* v. *Planning & Zoning Commission*, supra, 160 Conn. 250.

II

The plaintiffs also claim that the court improperly concluded that the notice of the proposed zone change filed by the defendant with the town clerk complied with the requirements of § 8-3 (a). Because the parties do not dispute the facts pertaining thereto, our review is plenary. *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006).

As the court found in its memorandum of decision, the defendant on January 13, 2011, filed in the office of the town clerk of Monroe a metes and bounds description of the boundaries of the portion of the property that it sought to have rezoned. That notice stated:

---

[23] During deliberations on the special exception application, the chairman of the commission acknowledged that the plan the commission ultimately approved "decimates the [setback and landscaping] buffer . . . ."

"Monroe Planning & Zoning Commission. Public Hearing [to be held]. Description of Area of Proposed Zone Change. Application of [the defendant] at 579 Main Street aka CT Route 25. Perimeter description for zone change #579 Main Street-Monroe. All that certain piece or parcel of land situated in the Town of Monroe, County of Fairfield and State of Connecticut and is shown on a map titled: A Compilation Plan for Zone Change . . . prepared for [the defendant]; Date 5/10/10; Revised 11/04/10, Scale: 1"=100'; prepared by Spath-Bjorklund Associates, Inc., being further bounded and described as follows.

"Southerly—350 feet more or less along land N/F (now or formerly) Wechter Central, LLC

"Westerly—202 feet more or less along the remaining land of [the property]

"Northerly—247 feet more or less along land N/F Babu

"Easterly—176 feet more or less along land of [the property] also being the current zone line

"Containing in all 1.15 acres more or less."[24] (Internal quotation marks omitted.)

The plaintiffs maintain that the notice provided by the defendant did not comply with § 8-3 (a), thereby depriving the commission of jurisdiction over the defendant's combined zone change and special permit application. See *Bridgeport* v. *Plan & Zoning Commission*, supra, 277 Conn. 275 ("[a] notice that does not comply with the requirements of § 8-3 [a] deprives the zoning commission of jurisdiction").

---

[24] It is undisputed that the defendant did not file a copy of the "Compilation Plan for Zone Change" map with the town clerk. Rather, that map was on file in the town's zoning office as part of the defendant's application.

Section 8-3 (a) sets forth the notice requirements for zone change applications before a zoning commission. It provides in relevant part: "A copy of such proposed . . . boundary shall be filed in the office of the town . . . clerk . . . for public inspection at least ten days before [the hearing on the proposed zone change]. . . ." General Statutes § 8-3 (a). The plaintiffs concede that the notice was provided in a timely manner, as it was filed with the office of the town clerk more than one month prior to the commencement of the public hearing. They nevertheless maintain that the notice failed to provide a sufficient description of the boundaries of the proposed zone change.

Our Supreme Court first "considered the question of what constitutes a sufficient description of a proposed boundary change for purposes of § 8-3 (a)" in *Bridgeport* v. *Plan & Zoning Commission*, supra, 277 Conn. 276. The defendant in that case filed a notice that did not describe the boundaries with any degree of specificity; instead, it stated that "[t]his property is approximately 320 acres in size and is known as Fairchild Wheeler Golf Course and is shown as parcel [no.] 1 on Tax Assessor's Map [no.] 24 and parcel [no.] 2 on the Tax Assessor['s] Map [no.] 11." (Internal quotation marks omitted.) Id., 271. In deeming that notice insufficient under § 8-3 (a), the court stated that "mere reference to a map on file in the offices of a separate agency does not constitute adequate notice of the boundaries of a property affected by a proposed zone change." Id., 279. Emphasizing the plain language of that statute, the court explained that "the boundary description of the affected property must be on file in the town clerk's office." Id., 280.

The present case is readily distinguishable. Unlike the defendant in *Bridgeport* v. *Plan & Zoning Commission*, supra, 277 Conn. 268, the defendant here filed in the

town clerk's office a detailed metes and bounds description of the boundaries of the portion of the property that it sought to have rezoned, measured from all cardinal points. Contra *Buddington Park Condominium Assn. v. Planning & Zoning Commission*, 125 Conn. App. 724, 733 n.4, 9 A.3d 426 (2010) (notice providing address of property and reference to assessor's map insufficient, as it "did not contain a metes and bounds description of the property"), cert. denied, 300 Conn. 914, 13 A.3d 1101 (2011). Although the notice filed by the defendant also contained a reference to a map on file in the Monroe zoning office, that reference merely augmented the specific description of the area in question.

Such references to maps in a notice filed pursuant to § 8-3 (a) are not improper. To the contrary, the court in *Bridgeport* v. *Plan & Zoning Commission*, supra, 277 Conn. 281, noted that "the boundary of the plaintiffs' property was clearly delineated on a one page map [and] there was nothing to prevent [the defendant] from filing a copy of that map with the town clerk."

As this court has observed, "[n]otice is not a rigid concept." *Twenty-Four Merrill Street Condominium Assn., Inc.* v. *Murray*, 96 Conn. App. 616, 623, 902 A.2d 24 (2006). That precept is exemplified in *Cassidy* v. *Zoning Commission*, 116 Conn. App. 542, 976 A.2d 29 (2009). At the outset, the court acknowledged that "[o]ur case law on the role of notice incorporated by reference in land use disputes is inconsistent." Id., 551. The court then contrasted the differing holdings of our Supreme Court in *Shrobar* v. *Jensen*, 158 Conn. 202, 257 A.2d 806 (1969), and *Bridgeport* v. *Plan & Zoning Commission*, supra, 277 Conn. 268. It stated: "[I]n [*Shrobar*] our Supreme Court rejected the plaintiffs' allegation that the zoning board had no jurisdiction to consider the defendants' application for a variance even though the public notice, on its face, referred to a

requested permit to improve and to reconstruct a gasoline station while the applicants in fact proposed to replace the existing structure with a new and larger facility. . . . The court held that notice of a hearing is not required to contain an accurate forecast of the precise action sought which will be taken on the subject matter referred to in the notice. . . . Anyone interested in the precise action sought could have consulted a plot plan showing all the details of the proposed changes which the defendants had filed . . . in the office of the zoning board." (Citation omitted; internal quotation marks omitted.) *Cassidy* v. *Zoning Commission*, supra, 551. The court continued: "In *Bridgeport*, the court determined that the notice the defendant was required to file at the town clerk's office was insufficient because it incorporated by reference maps on file in the tax assessor's office, thereby requiring interested parties to look beyond the contents of the notice to determine the boundaries of the proposed zoning change. . . . *Bridgeport* . . . stands for the general proposition that notice will be insufficient if it requires members of the public to conduct additional research simply to determine whether they will be affected by proposed zoning actions." Id., 553–54.

Although *Shrobar* and *Bridgeport* contain seemingly contradictory holdings, former Chief Justice Peters, writing for the court in *Cassidy*, harmonized that precedent of this state's highest court, stating: *"Bridgeport* may, however, be reconciled with *Shrobar* by limiting *Shrobar*'s holding to cases in which the information provided in the public notice, while incomplete, can reasonably be held to have informed the reader about the major contours of the project at issue. In *Shrobar*, the published notice informed the public that the application contemplated the improvement and reconstruction of a gasoline station at a designated site, while the document on file sought authorization to replace and

to enlarge the existing structure at the same site. Thus, in *Shrobar*, the published notice sufficiently informed the public of the site of the changes so that anyone with an interest in that location would have been prompted to check the application to gauge the scope and character of the proposed changes." (Emphasis omitted.) Id., 554.

In light of the foregoing, the plaintiffs' challenge to the adequacy of the notice filed by the defendant fails. The information provided in the metes and bounds description apprised the public, at a minimum, of the "major contours of the project at issue." Id. To the extent that the plaintiffs complain that the description failed to describe certain "jogs" in the property lines, we note that the Superior Court expressly found that "[t]he distances contained in the [metes and bounds] description include the area contained in the 'jogs.' "[25] We concur with the court's assessment that "[g]iven the metes and bounds description, the failure to describe nuances created by 'jogs' is not sufficient to render the [notice] inadequate . . . ." The notice further informed the public that it pertained to the defendant's pending zone change application, on which the commission would be holding a public hearing. Moreover, the notice specifically referred to the parcel of land "shown on a map titled: A Compilation Plan for Zone Change . . . prepared for [the defendant]; Date 5/10/10; Revised 11/04/10, Scale: 1"=100'; prepared by Spath-Bjorklund Associates, Inc." As a result, anyone potentially impacted by the proposed zone change was "prompted to check the application [on file in the zoning office] to gauge the scope and character of the proposed changes." *Cassidy* v. *Zoning Commission*, supra, 116 Conn. App. 554. We therefore conclude that the notice of the proposed zone change filed by the defendants

---

[25] In their appellate brief, the plaintiffs aver that "there is no dispute as to the facts" found by the court.

contained sufficient specificity and, thus, complied with § 8-3 (a).

The judgment is reversed in part and the case is remanded with direction to render judgment sustaining the plaintiffs' appeal only as to the granting of the special exception. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.