# JOHN TILLMAN ET AL. *v.* PLANNING AND ZONING COMMISSION OF THE CITY OF SHELTON ET AL.
## (SC 20549)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The plaintiffs, who own real property in the city of Shelton, appealed to
the trial court from the decision of the defendant planning and zoning
commission approving an application for a planned development district
submitted by the defendant S Co. The trial court dismissed the plaintiffs'
appeal from the commission's decision, and the plaintiffs appealed,
claiming, inter alia, that this court's decision in *Campion* v. *Board of
Alderman* (278 Conn. 500), in which the court concluded that a special
act of the legislature authorizing zoning in the city of New Haven allowed
for the creation of a planned development district, did not authorize
municipalities, such as Shelton, that derive their authority to zone by
statute (§ 8-2), rather than by a special act, to establish such districts.
*Held*:

1. The plaintiffs could not prevail on their claim that the zoning authority
   conferred by § 8-2 did not support the creation of planned development
   districts: a comparison of the language in the special act at issue in
   *Campion*, the language of the enabling act at issue in *Sheridan* v.

---

who meet the conditions under which the provisions of § 54-91g apply. This
is the sole constitutional argument that the defendant raises in this appeal.

Tillman *v.* Planning & Zoning Commission

*Planning Board* (159 Conn. 1), and the language of § 8-2, which allowed the defendant commission to create and alter zones, led this court to conclude that § 8-2 permits the creation of planned development districts like the one at issue in the present case; moreover, the legislature's prior repeal of legislation that provided for a detailed procedure for the approval of planned developments did not evince a legislative intent to eliminate or severely limit the use of planned developments, as that legislation was repealed because its provisions were largely viewed as unnecessary and unduly burdensome, and the legislature's enactment of a statute (§ 8-2m) expressly allowing for the use of flexible zoning techniques was not intended to preclude the generalized application of § 8-2 or to restrict the zoning devices that it allows; furthermore, there was no indication that the development in the present case resulted from impermissible spot zoning, as previous claims of spot zoning had involved smaller areas than the area at issue in the present case, and there was little reason to disagree with the commission's determination that the proposal was consistent with Shelton's comprehensive plan for development, as the majority of the subject parcel had been located in an industrial zone for more than fifty years, and the applicable regulations identified the area at issue as an appropriate location for planned development districts.

2. There was no merit to the plaintiffs' claim that the use of planned development districts in Shelton, generally, and the creation of the planned development district proposed by S Co., in particular, violated the uniformity requirement of § 8-2: the uniformity requirement did not require regulations governing adjacent zones to be consistent, and § 8-2 indicated that regulations in one district may differ from those in another district; moreover, the uniformity requirement does not prohibit the commission from permitting a combination of residential, commercial and professional uses, and the commission's decision created a new zone governed by a single set of regulations, including a specific, preapproved mixture of uses for the planned development district and a detailed set of standards applicable to the various classes and kinds of structures to be constructed therein.

3. The commission's decision, which delineated separate development areas, did not result in an unlawful subdivision: even though the various development areas were occasionally referred to in the record as parcels, there was no indication that the commission's approval of the planned development district caused the alteration of any previously existing property line, and the statement of uses and standards approved by the commission in granting S Co.'s application noted that any subdivision of the subject parcel would require separate approval.

Argued February 18—officially released October 20, 2021*

* October 20, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

341 Conn. 117 FEBRUARY, 2022 119

Tillman *v.* Planning & Zoning Commission

*Procedural History*

Appeal from the decision of the named defendant approving the application of Shelter Ridge Associates, LLC, for a planned development district, brought to the Superior Court in the judicial district of Ansonia-Milford; thereafter, Shelter Ridge Associates, LLC, was permitted to intervene as a defendant; subsequently, the case was transferred to the land use litigation docket in the judicial district of Hartford, where the case was tried to the court, *Domnarski, J.*, who, exercising the powers of the Superior Court, rendered judgment dismissing the appeal, from which the plaintiffs appealed. *Affirmed.*

*Joel Z. Green*, with whom, on the brief, was *Linda Pesce Laske*, for the appellants (plaintiffs).

*Francis A. Teodosio*, for the appellee (named defendant).

*Dominick J. Thomas, Jr.*, with whom was *Ian A. Cole*, for the appellee (defendant Shelter Ridge Associates, LLC).

*Opinion*

KAHN, J. The principal question raised in this appeal is whether the zoning authority granted to municipalities by General Statutes § 8-2[1] permits the use of a zoning device known as a planned development district. The plaintiffs, John Tillman and Judith Tillman, appeal from the decision of the trial court dismissing their appeal from the decision of the named defendant, the Planning and Zoning Commission of the City of Shelton (commission), approving an application for such a dis-

---

[1] We note that the legislature has made several amendments to § 8-2 since the events underlying the present appeal. See, e.g., Public Acts 2018, No. 18-28, §§ 1–2; see also Public Acts 2021, No. 21-29, § 4. Those amendments, however, are not relevant to the issues presented in the present appeal. For the sake of simplicity, we refer to the current revision of the statute.

Tillman *v.* Planning & Zoning Commission

trict submitted by the defendant Shelter Ridge Associates, LLC (Shelter Ridge). On appeal, the plaintiffs claim that (1) this court's decision in *Campion* v. *Board of Aldermen*, 278 Conn. 500, 899 A.2d 542 (2006), which concluded that the special act authorizing zoning in the city of New Haven allows for the creation of a planned development district, is inapplicable to municipalities that derive their authority to zone from § 8-2, (2) the planned development district proposed by Shelter Ridge violates the uniformity requirement contained in § 8-2, and (3) the commission's decision resulted in an unlawful subdivision. For the reasons that follow, we reject each of these claims and, accordingly, affirm the judgment of the trial court.

We begin by briefly reviewing the municipal zoning regulations relevant to the present appeal. Chapter 3, § 34.1, of the Shelton Zoning Regulations (regulations) authorizes the creation of planned development districts in order to encourage "unique and desirable" developments that cannot be accommodated by conventional zoning. Those regulations provide that "[e]ach [planned development district] is [an] independent zoning district created to accomplish a specific purpose, complete with its unique and narrowly drawn permitted uses . . . ." Shelton Zoning Regs., c. 3, § 34.1. Such zones can be established in a set of specifically mapped "[s]pecial [d]evelopment [a]rea[s]" and may be used to incorporate those uses "appropriate" to a mixed-use development.[2] Id. In addition to the foregoing limitations, the regulations detail minimum lot sizes, the maximum percentage of lot coverage, applicable floor area ratios, restrictions with respect to building height, various requirements with respect to utility connections,

_____

[2] The regulations expressly provide that a planned development district "is not allowed on any site or parcel that is entirely surrounded by single family residential zones" and "shall not be used when an alternative, conventional zoning district is available." Shelton Zoning Regs., c. 3, § 34.1.

Tillman *v.* Planning & Zoning Commission

and additional provisions with respect to both architecture and the preservation of natural features. See id., §§ 34.3.1 through 34.3.8.

Approval of a new planned development district zone proceeds in a series of distinct stages. First, the applicant engages in an informal review by the commission and its staff. Id., § 34.4. The applicant then submits a formal proposal that includes both a written statement "identifying the permitted uses and setting forth the specific area, location and bulk standards to be applicable to the district"; id., § 34.5.1; and an initial development concept plan including, inter alia, "property maps, [s]ite [p]lans, [a]rchitectural [p]lans and other drawings as relevant in sufficient detail to show the existing conditions and improvements proposed to be erected on the site . . . ."[3] Id., § 34.5.2. Following the receipt of an application, the commission can solicit comments from numerous municipal officials and authorize the preparation of any independent reports that it deems necessary for its consideration. Id., § 34.6. The commission is then required by regulation, as it would be for any application for an amendment to a zoning regulation, to hold a duly noticed public hearing. Id., § 34.7.

The commission may approve an initial development concept plan and adopt a planned development district only if it makes several specific factual findings. Id., §§ 34.8 and 34.9. Most notably for present purposes,

---

[3] In addition to mapping both existing and proposed buildings and uses, an applicant is also required to submit information relating to vehicular and pedestrian traffic, parking facilities, access roads, lighting, open areas, landscaping, utilities, floor plans, exterior elevations, drainage plans, soil and geology reports, a sedimentation and erosion control plan, and "[a]ny additional information which the [c]ommission may reasonably require . . . ." Shelton Zoning Regs., c. 3, § 34.5.2 (a) through (n). This last category of information may include marketability studies, economic impact analysis, perspective renderings, lists of proposed covenants or restrictions, maintenance schedules, and additional specifications relating to development phasing. Id., § 34.5.2 (n).

Tillman *v.* Planning & Zoning Commission

the commission must find that a proposal "will not have a significant adverse impact [on] surrounding properties or on property values in the area"; id., § 34.8 (f); that "[a]nother zoning district could not be appropriately established to accomplish such purposes"; id., § 34.9 (c); and that the proposal "will be consistent with any comprehensive plan of development . . . for the area in which it is located . . . ." Id., § 34.9 (d). If a planned development district is approved, the commission adopts a "[s]tatement of [u]ses and [s]tandards" as an amendment to its zoning regulations that "authorize[s] uses, building structures and site development in accordance with the approved [i]nitial [d]evelopment [c]oncept [p]lan," and updates its official zoning map to show the creation of a new zone. Id., § 34.13. An applicant then has a period of six months to submit detailed final site development plans to the commission. Id., § 34.10.

Although the Appellate Court once described planned development districts as "creature[s] not normally spotted in Connecticut's jurisprudential forests"; (internal quotation marks omitted) *Blakeman* v. *Planning & Zoning Commission*, 82 Conn. App. 632, 637 n.7, 846 A.2d 950, cert. denied, 270 Conn. 905, 853 A.2d 521 (2004); the trial court in the present case accurately noted that they have "thrived in the environs of Shelton." Specifically, the trial court observed that this flexible zoning technique has been used more than seventy-five times in the city of Shelton alone. Indeed, an inventory of planned development districts set forth in an appendix to the regulations indicates a more or less consistent use of that device in Shelton since the late 1970s.

The following undisputed facts and procedural history relating to the present case are relevant to our analysis. On March 16, 2016, Shelter Ridge filed an application with the commission seeking the creation of a planned development district on a parcel of real prop-

Tillman *v.* Planning & Zoning Commission

erty consisting of approximately 121 acres of land. That parcel, almost all of which had existed within a "[l]ight [i]ndustrial [p]ark" zone for more than fifty years,[4] is bounded by (1) a one-half mile stretch of Bridgeport Avenue[5] to the east, (2) approximately 1800 feet of frontage on Mill Street to the south, (3) the rear lot lines of several residential properties on Old Kings Highway, certain parcels maintained by Shelton as open space, and a short length of Buddington Road to the west, and (4) a mobile home park and a few office buildings to the north. The parcel slopes steeply up from Bridgeport Avenue and Mill Street to a ridgeline running generally north to south and has areas of exposed bedrock. The property is also bisected by a series of overhead power transmission lines and an underground gas transmission line. Several wetlands, including a vernal pool, are located on the western side of the parcel. Although Shelton's 2006 plan of conservation and development contemplated improvement of this land for either office space or industrial use, the parcel has remained vacant with the exception of one single-family home near Buddington Road.

Shelter Ridge submitted a proposed statement of uses and standards for this planned development district that contemplated the construction of buildings in five separate development areas. The two areas closest to Bridgeport Avenue were reserved for retail use. The other three development areas, which are located on the interior of the parcel, were slated for (1) a mixture of retail, offices and food services, (2) medical and professional offices, and (3) a multistory residential structure. The remaining land, which consisted of

_____

[4] The record indicates that approximately one acre of the property fell within a residential zone.

[5] Bridgeport Avenue, also known as state route 714, is a major thoroughfare in Shelton. Certain areas adjacent to it, including the parcel at issue in this case, fell within a special development area and, thus, were available for improvement as a planned development district.

Tillman *v.* Planning & Zoning Commission

approximately twenty-four acres near the western edges of the parcel, would be traversed by a proposed hiking trail and would remain otherwise undeveloped as dedicated open space. Maps submitted with the proposal showed the size and location of, inter alia, proposed buildings, parking lots, and various internal access roads. A series of perspective renderings showed, in great detail, the visual impacts of the proposed development.

In 2016, the commission held six public hearings relating to this development over a period of several months. As the trial court noted, "the commission had before it some 65 exhibits, including a full engineering report . . . a 900 page traffic impact study . . . supplemented by a revision to address certain questions from the commission . . . a retail demand study . . . and the blowup of the rings and drive times related to the retail analysis . . . an environmental report . . . and a traffic peer review. . . . The applicant also presented numerous articles and data related to existing apartment developments, parking, school-age children, fire and safety, and downtown development. . . . All of the applicant's submissions were supplemented by the testimony of the authors of the reports." (Citations omitted.)

Public opposition to the development was substantial and focused on several significant concerns relating to traffic, effects on nearby residential areas, and various environmental impacts. As a result of those concerns, Shelter Ridge modified its initial proposal (1) to replace a proposed public entrance located on Buddington Road with a gated access limited to emergency personnel, (2) to reorganize certain parking facilities to increase dedicated open space, (3) to reduce the size of the residential structure from nine stories to no more than five stories, and (4) to abandon previous plans for an assisted living facility.

Tillman *v.* Planning & Zoning Commission

On March 7, 2017, the commission adopted a resolution approving both Shelter Ridge's application and a detailed statement of uses and standards containing a series of additional conditions and restrictions. In making its decision, the commission explicitly found that "[d]ifficult physical site features, coupled with marketing constraints, have precluded the ability to develop the site for light industrial and/or major office building development," that "[t]he subject property can be improved to accommodate the proposed mixed-use development in a manner that minimizes intrusion on neighboring areas," and that the proposal was "consistent with the comprehensive plan of zoning for the area . . . ."

The plaintiffs, the owners of a single family residence located on an adjacent parcel, subsequently appealed to the trial court pursuant to General Statutes § 8-8.[6] In that appeal, the plaintiffs argued, inter alia, that (1) municipalities deriving their authority to zone from § 8-2 lack the authority to create planned development districts, (2) the proposed planned development district violates the uniformity requirement contained in § 8-2, and (3) the commission's decision resulted in an unlawful subdivision under General Statutes § 8-18.

The trial court subsequently issued a detailed, thorough, and well reasoned memorandum of decision, disagreeing with each of these claims. The trial court reviewed *Sheridan* v. *Planning Board*, 159 Conn. 1, 266 A.2d 396 (1969), and *Campion* v. *Board of Aldermen*, supra, 278 Conn. 500, and concluded that those decisions implicitly supported "the conclusion that § 8-2 authorizes the creation of [planned development districts]." The trial court also concluded that the uniformity requirement set forth in § 8-2 mandates only "intradis-

_____
[6] Although Shelter Ridge was not initially named as a party defendant, the trial court subsequently granted it permission to intervene.

Tillman *v.* Planning & Zoning Commission

trict uniformity'' and that, because the present case involved the creation of an entirely new zone governed by a single set of regulations, the commission's actions did not violate that statutory mandate. (Emphasis omitted; internal quotation marks omitted.) Finally, the trial court rejected the plaintiffs' argument that the commission had created an unlawful subdivision because the mere discussion of separate ''development areas'' did not amount to a division of the larger parcel into smaller lots. As a result of these conclusions, the trial court dismissed the plaintiffs' appeal from the commission's decision. This appeal followed.[7]

In the present appeal, the plaintiffs renew their claims that (1) municipalities, like Shelton, that derive their zoning powers from § 8-2, rather than a special act, lack the authority to establish planned development districts; (2) the proposal at issue in this case violates the uniformity requirement contained in § 8-2, and (3) the commission's decision constituted an unlawful subdivision. We address each of these claims in turn.

I

The plaintiffs' principal claim is that the zoning authority conferred by § 8-2 does not support the creation of planned development districts. In support of this claim, the plaintiffs argue that this court's decision in *Campion* v. *Board of Aldermen*, supra, 278 Conn. 514–15, which concluded that the 1925 special act authorizing zoning in New Haven allowed for the creation of planned development districts, does not extend permission to other municipalities, acting under § 8-2, to create similar planned development districts. The defendants respond by arguing that both § 8-2 and the reasoning

---

[7] The Appellate Court granted certification for the plaintiffs to appeal from the judgment of the trial court pursuant to General Statutes § 8-9, and we subsequently transferred that appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

of *Campion* are not so limited. For the reasons that follow, we agree with the defendants.

Before turning to the specific question at issue, we begin by setting forth certain general principles of law relevant to our consideration of this appeal. In this state, it is well established that "zoning authorities can only exercise such power as has been validly conferred upon them by the General Assembly." (Internal quotation marks omitted.) *Eden* v. *Town Plan & Zoning Commission*, 139 Conn. 59, 63, 89 A.2d 746 (1952); see also *Capalbo* v. *Planning & Zoning Board of Appeals*, 208 Conn. 480, 490, 547 A.2d 528 (1988); *MacKenzie* v. *Planning & Zoning Commission*, 146 Conn. App. 406, 426, 77 A.3d 904 (2013); *Keiser* v. *Zoning Commission*, 72 Conn. App. 721, 729, 806 A.2d 103, cert. denied, 262 Conn. 909, 810 A.2d 274 (2002). Indeed, "[n]o administrative or regulatory body can modify, abridge or otherwise change the statutory provisions under which it acquires authority unless the statute specifically grants it that power." (Internal quotation marks omitted.) *Finn* v. *Planning & Zoning Commission*, 156 Conn. 540, 546, 244 A.2d 391 (1968).

"Municipalities in Connecticut may exercise zoning power either by adopting the provisions of chapter 124 of the General Statutes . . . or by enacting a municipal charter authorized by a special act of the legislature. . . . In either case, the power of the local zoning authority to adopt regulations is limited by the terms of the statute or special act." (Internal quotation marks omitted.) *Campion* v. *Board of Aldermen*, supra, 278 Conn. 510–11. Whether the legislature has granted a particular power to a municipality presents a question of statutory interpretation and, thus, is subject to plenary review. Id., 509.

"In traditional zoning appeals, the scope of judicial review depends on whether the zoning commission has

acted in its legislative or administrative capacity. The discretion of a legislative body, because of its constituted role as formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function. . . . Acting in such legislative capacity, the local [zoning] board is free to amend [or to refuse to amend] its regulations whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for [or the undesirability of] a change. . . . Zoning must be sufficiently flexible to meet the demands of increased population and evolutionary changes in such fields as architecture, transportation, and redevelopment. . . . The responsibility for meeting these demands rests, under our law, with the reasoned discretion of each municipality acting through its duly authorized zoning commission. . . . In contrast, when acting in an administrative capacity, a zoning commission's more limited function is to determine whether the applicant's proposed use is one which satisfies the standards set forth in the [existing] regulations and the statutes. . . . In fulfilling its administrative function, a zoning commission is less concerned with the development of public policy than with the correct application of law to facts in the particular case.'' (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 150–51, 653 A.2d 798 (1995); see also *Campion* v. *Board of Aldermen*, supra, 278 Conn. 526–27.

There is no dispute that Shelton derives its authority to adopt zoning regulations from chapter 124 of the General Statutes. See T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) pp. 38–42. The provision of that chapter at issue in the present case, § 8-2, provides in relevant part: ''The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories

Tillman *v.* Planning & Zoning Commission

and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes . . . . Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district, and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception . . . . Such regulations shall be made in accordance with a comprehensive plan and in adopting such regulations the commission shall consider the plan of conservation and development prepared under section 8-23. . . . Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. . . .'' General Statutes § 8-2 (a).

With this background in mind, we turn to the narrow question of whether the grant of zoning authority contained in § 8-2 permits a municipal zoning authority to create planned development districts when it acts in a legislative capacity. In answering this question, we do not write on a blank slate. As the trial court in the present case aptly noted, this court has examined the validity of modern flexible zoning techniques in both *Sheridan* v. *Planning Board*, supra, 159 Conn. 1, and

Tillman *v.* Planning & Zoning Commission

*Campion* v. *Board of Aldermen*, supra, 278 Conn. 500.
A brief review of those two decisions is instructive.

*Sheridan* related to the use of a modern zoning technique referred to as a floating zone. See *Sheridan* v. *Planning Board*, supra, 159 Conn. 16. The most traditional and common form of zoning, called Euclidean zoning, is "a system . . . whereby a [municipality] is divided into areas in which specific uses of land are permitted." Merriam-Webster's Dictionary, available at https://www.merriam-webster.com/legal/Euclidean%20 zoning (last visited October 18, 2021); see also *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114, 71 L. Ed. 303 (1926); R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 1:1, p. 2. By contrast, a floating zone involves the initial creation of an unmapped zone that is later applied to a particular piece of property. As such, it "differs from the traditional [Euclidean] zone in that it has no defined boundaries and is said to 'float' over the entire area where it may eventually be established." 9 R. Fuller, supra, § 3.9, p. 42; see also T. Tondro, supra, pp. 70–72.

As in the present case, the plaintiffs in *Sheridan* claimed that the relevant enabling act did not permit the city of Stamford to use a floating zone device. *Sheridan* v. *Planning Board*, supra, 159 Conn. 15. Our rejection of that claim was straightforward. This court held that the relevant provisions of Stamford's enabling act,[8] which were similar to those in § 8-2, clearly allowed the municipal authority to both adopt and amend zoning

_____

[8] The municipality in *Sheridan*, the city of Stamford, had enacted a charter authorized by a special act of the legislature, providing in relevant part: "The zoning board is authorized to regulate the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes . . . ." (Internal quotation marks omitted.) *Sheridan* v. *Planning Board*, supra, 159 Conn. 17–18.

boundaries. See id., 18. We noted that the language of the enabling act, "just as that in . . . § 8-2, is sufficiently broad to permit the creation of floating zones. In creating a floating zone, and in applying it to a particular area, the . . . zoning board is regulating the location and use of buildings and land in a manner which clearly is permitted under the enabling act in question." Id. The fact that floating zones differed from more traditional, Euclidean means of zoning was irrelevant; the legislative function exercised by the municipal zoning authority in that case, we noted, had simply met an existing "need for flexibility in modern zoning ordinances . . . ." Id., 17.

Almost forty years later, a similar question arose with respect to the use of planned development districts in the city of New Haven. See *Campion* v. *Board of Aldermen*, supra, 278 Conn. 515. New Haven, like Stamford, also exercised its zoning authority pursuant to a special act. Id., 510–13. The relevant provisions of that legislation provided New Haven's Board of Aldermen with the authority to "divide the city of New Haven into districts of such number, shape and area as may best be suited to carry out the provisions of [the] act." (Internal quotation marks omitted.) Id., 514.

Relying on our reasoning in *Sheridan*, this court similary held that this language was "sufficiently broad to permit the creation of planned development districts . . . ." Id., 518. In the course of our analysis, we compared planned development districts to floating zones and noted that, notwithstanding certain procedural distinctions, both of those devices "[alter] the zone boundaries of [an] area by carving a new zone out of an existing one." (Internal quotation marks omitted.) Id., 518–19. The creation of planned development districts was, therefore, permissible in New Haven because its zoning enabling act, like Stamford's, "authorize[d] the city to create new zones, as well as to make alterations

Tillman *v.* Planning & Zoning Commission

to the zones previously created." Id., 515. Our holding, reduced to a single sentence, was simply that "[t]he approval of a planned development district is not different from the creation of any other new zoning district . . . ." Id., 514. In reaching this result, we expressly rejected the plaintiffs' claim that the creation of planned development districts "improperly breaks from the Euclidean zoning model," stating, in no uncertain terms, that "we never have held . . . that zoning ordinances must be judged by the standards of traditional Euclidean zoning." Id., 529–30.

A comparison of the language in the enabling acts in both *Sheridan* and *Campion* to the language contained in § 8-2 provides us with no principled basis to conclude that the legislature intended to allow for the use of modern, flexible zoning techniques in only a handful of municipalities. The special act cited in *Sheridan* permitted the city of Stamford to regulate "the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes . . . ." (Internal quotation marks omitted.) *Sheridan* v. *Planning Board*, supra, 159 Conn. 17–18. That exact language appears in § 8-2. The special act at issue in *Campion* allowed the New Haven Board of Aldermen to "divide the city of New Haven into districts of such number, shape and area as may be best suited to carry out the provisions of [the] act." (Internal quotation marks omitted.) *Campion* v. *Board of Aldermen*, supra, 278 Conn. 514. Again, almost the exact same language can be found in § 8-2. As in those cases, the relevant question in the present case "is not whether the [enabling act] authorizes 'planned development districts' by name, but whether it authorizes the city to create new zones, as well as to make

Tillman *v.* Planning & Zoning Commission

alterations to the zones previously created." Id., 515.
The plaintiffs readily admit that § 8-2 allows the com-
mission to both create and alter zones. As a result, we
conclude that the language of § 8-2 permits the creation
of planned development districts like the one at issue
in the present case.[9]

In urging us to reach the opposite conclusion, the
plaintiffs point to two legislative actions that, they
argue, evince the General Assembly's intent either to
eliminate or to severely limit the use of planned develop-
ments. The first is the repeal of chapter 124a of the
1985 revision of the General Statutes. See Public Acts
1985, No. 85-409, § 7. The provisions in that chapter,
which provided a detailed procedure for the approval
of planned developments; see General Statutes (Rev.
to 1985) § 8-13b et seq.; were, however, repealed
because they were largely viewed as unnecessary and
unduly burdensome. See D. Mandelker, "New Perspec-
tives on Planned Unit Developments," 52 Real Prop.
Tr. & Est. L. J. 229, 231 n.4 (2017); A. Martindale,
"Replacing the Hardship Doctrine: A Workable, Equita-
ble Test for Zoning Variances," 20 Conn. L. Rev. 669,
698 n.153 (1988). The legislature was well aware of the
fact that many municipalities had enacted regulations
providing for the use of such devices pursuant to their
general zoning enabling authority, and the debate atten-
dant to the 1985 repeal contains no support for the

_____

[9] Although this conclusion is in accord with the law of other jurisdictions;
see 5 A. Rathkopf & D. Rathkopf, The Law of Zoning and Planning (4th Ed.
2011) § 88:2, p. 88-12; see also 3 P. Salkin, American Law of Zoning (5th Ed.
2011) § 24:18, p. 24-40; we recognize that a Connecticut land use treatise
suggests that *Campion* "seems limited on its facts to the provisions of the
New Haven special act and should not be construed as allowing [planned
development districts] to municipalities acting under the general statutes,
which do not contain similar zoning authorization." 9 R. Fuller, supra, § 4:5,
p. 73. In light of the striking similarities between the language of the 1925
special act and § 8-2, we decline to conclude that the holding of *Campion*
is so limited.

Tillman *v.* Planning & Zoning Commission

proposition that the legislature intended a wholesale elimination of similar devices. See 28 S. Proc., Pt. 7, 1985 Sess., p. 2218, remarks of Senator John F. Consoli (''[C]urrently about sixty municipalities have adopted zoning regulations covering [similar] development[s] . . . . None of these have relied on [chapter 124a] for their authority. Instead, they have all relied on general zoning authority which is far less detailed. This bill would repeal specific statutory standards and procedures governing municipal zoning for [planned unit developments] leaving the municipalities to regulate them under the general zoning statutes . . . .''); see also T. Tondro, supra, pp. 81–82 n.168.

The second legislative action cited by the plaintiffs is the enactment of General Statutes § 8-2m.[10] That statute expressly allows for the use of various flexible zoning techniques, including floating zones, overlay zones, and planned development districts, in an exceedingly narrow class of municipalities exercising zoning authority pursuant to a special act. Public Acts 2006, No. 06-128, § 2 (P.A. 06-128). The class is so narrowly drawn, in fact, that the parties in the present case agree that only the city of New Haven falls within its confines. The

_____

[10] General Statutes § 8-2m provides: ''The zoning authority of any municipality that (1) was incorporated in 1784, (2) has a mayor and board of alderman form of government, and (3) exercises zoning power pursuant to a special act, may provide for floating and overlay zones and flexible zoning districts, including, but not limited to, planned development districts, planned development units, special design districts and planned area developments. The regulations shall establish standards for such zones and districts. Flexible zoning districts established under such regulations shall be designed for the betterment of the municipality and the floating and overlay zones and neighborhood in which they are located and shall not establish in a residential zone a zone that is less restrictive with respect to uses than the underlying zone of the flexible zoning district. Such regulations shall not authorize the expansion of a pre-existing, nonconforming use. Notwithstanding the provisions of this section, no planned development district shall be approved which would permit a use or authorize the expansion of a pre-existing nonconforming use where the underlying zone is a residential zone.''

Tillman *v.* Planning & Zoning Commission

plaintiffs invite us to infer from this express grant of authority that the legislature intended, by negative implication, to preclude the creation of planned development districts in every other municipality. We decline to accept this line of reasoning. The plaintiff's logic, if adopted, would compel the conclusion that New Haven is the only municipality with the authority to use other devices mentioned in § 8-2m, like floating zones, that are derived implicitly from generalized grants of zoning authority. Such an interpretation is not supported by either the text of § 8-2m or the legislative history preceding its enactment. See 49 S. Proc., Pt. 9, 2006 Sess., p. 2647, remarks of Senator Toni Nathaniel Harp (noting that bill was intended to "clarif[y] what the city of New Haven can do relative to planned development districts"); 49 H.R. Proc., Pt. 18, 2006 Sess., p. 5501, remarks of Representative Robert W. Megna (noting that bill "clarifies the use of overlay zones within the [c]ity of New Haven"). The better reading, we believe, is that § 8-2m constitutes a narrow legislative response to the Appellate Court's decision in *Campion*[11] that was not intended to preclude the generalized application of § 8-2 or to otherwise restrict the zoning devices that it allows. As noted previously; see footnote 1 of this opinion; the General Assembly has made several recent amendments to § 8-2. If, as the plaintiffs contend, the legislature intended the passage of § 8-2m to express a broader intent that the use of modern, flexible zoning techniques should be prohibited outside of New Haven,

[11] The bill giving rise to § 8-2m; see P.A. 06-128; was debated and passed shortly after the Appellate Court's decision in *Campion* was released, which had held that the city of New Haven lacked the authority to create planned development districts under the terms of its special act. *Campion* v. *Board of Alderman*, 85 Conn. App. 820, 822 n.3, 859 A.2d 586 (2004), rev'd, 278 Conn. 500, 899 A.2d 542 (2006). After P.A. 06-128 was enacted, but before it became effective, this court reversed the Appellate Court's conclusion. *Campion* v. *Board of Aldermen*, supra, 278 Conn. 502, 505. The following day, P.A. 06-128, § 2, was made effective retroactively to the date of its enactment. See Public Acts 2006, No. 06-196, § 290.

Tillman *v.* Planning & Zoning Commission

it has had multiple opportunities over the past fifteen years to address the continued use of such devices in other parts of the state. Its failure to do so provides further support for our interpretation of § 8-2m.

Finally, the plaintiffs contend, and we agree, that the developer driven, case-by-case approach inherent to modern zoning techniques such as planned development districts significantly heightens the risk of spot zoning and favoritism in the municipal land use process. See, e.g., *Blakeman* v. *Planning & Zoning Commission*, supra, 82 Conn. App. 637–38 n.7; cf. 9 R. Fuller, supra, § 3:9, pp. 43–44 (discussing same concerns in relation to floating zones). Even a cursory review of the appendix to the regulations demonstrates that an excessive use of that device in Shelton has led to the creation of dozens of entirely new, single owner zones that are as small as 0.3 acres. We take this opportunity to reiterate the fact that one of the essential goals of zoning is to encourage stability and predictability in land use. See, e.g., *Damick* v. *Planning & Zoning Commission*, 158 Conn. 78, 84, 256 A.2d 428 (1969). To that end, we emphasize that the traditional scope of judicial review applicable to claims of spot zoning remains unchanged in this context.

Nevertheless, we see no indication that the particular development at issue in the present case resulted from impermissible spot zoning. As this court has previously stated: "Two elements must be satisfied before spot zoning can be said to exist. First, the zone change must concern a small area of land. Second, the change must be out of harmony with the comprehensive plan for zoning adopted to serve the needs of the community as a whole." *Blaker* v. *Planning & Zoning Commission*, 212 Conn. 471, 483, 562 A.2d 1093 (1989). The proposed planned development district at issue in this case consists of approximately 121 acres. Previous claims of spot zoning have involved far smaller areas. *Campion*

v. *Board of Aldermen*, supra, 278 Conn. 506, 532 (4.04 acres); *Morningside Assn.* v. *Planning & Zoning Board*, 162 Conn. 154, 156, 161, 292 A.2d 893 (1972) (6.5 acres); *Kutcher* v. *Town Planning Commission*, 138 Conn. 705, 711, 88 A.2d 538 (1952) (2.5 acres) (*Brown, C. J.*, dissenting). There is also little reason to disagree with the commission's determination that the proposal at issue is consistent with Shelton's comprehensive plan for development. The majority of the subject parcel has been located in an industrial zone for more than fifty years, and the regulations specifically identify the area around Bridgeport Avenue as an appropriate location for planned development districts. In light of these facts, we do not believe that the commission's actions in the present case constituted impermissible spot zoning.

II

The plaintiffs' second claim is that the use of planned development districts in Shelton, generally, and the creation of this planned development district, in particular, violate the uniformity requirement contained in § 8-2. This claim is subject to plenary review. See, e.g., *MacKenzie* v. *Planning & Zoning Commission*, supra, 146 Conn. App. 420. For the reasons that follow, we conclude that it lacks merit.

General Statutes § 8-2 (a) provides in relevant part: "All . . . regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district . . . ."

This statutory provision requires that zoning regulations "are sufficiently precise so as to apprise both the zoning commission and an applicant of what is required, as well as to provide guidance to the zoning commission in applying the regulation, and to ensure equal treatment to each applicant subject to the regulation." *Harris* v. *Zoning Commission*, 259 Conn. 402, 434–35, 788

Tillman *v.* Planning & Zoning Commission

A.2d 1239 (2002). "The obvious purpose of [this require-ment] . . . is to assure property owners that there shall be no improper discrimination, all owners of the same class and in the same district being treated alike with provision for relief in cases of exceptional difficulty or unusual hardship by action of the zoning board of appeals." *Veseskis* v. *Zoning Commission*, 168 Conn. 358, 360, 362 A.2d 538 (1975); see also *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 147. Put simply, "[t]he thrust of the statutory requirement of uniformity is equal treatment." *Harris* v. *Zoning Commission*, supra, 431.

Cases in which courts have found a violation of the uniformity requirement have a singular, common ele-ment: they all involve a waiver or modification of a zoning regulation for some, but not all, parcels *within a particular zone*. For example, in *Langer* v. *Planning & Zoning Commission*, 163 Conn. 453, 313 A.2d 44 (1972), we concluded that a regulation permitting a municipal planning and zoning commission, rather than a board of zoning appeals, to "modify, vary, waive or accept other uses" on an "application-to-application basis" was invalid because it permitted the commission to treat some parcels in the district differently from others. (Internal quotation marks omitted.) Id., 457–58. Like-wise, in *MacKenzie* v. *Planning & Zoning Commis-sion*, supra, 146 Conn. App. 406, the Appellate Court concluded that a municipal planning and zoning com-mission violated the uniformity rule by waiving mini-mum setback and landscaped buffer requirements that were otherwise applicable to all other properties in the same district.[12] See id., 420, 431–33; see also, e.g., *Harris*

---

[12] In *MacKenzie*, the Appellate Court contrasted the facts before it, which involved altering requirements imposed on a particular parcel in a manner that distinguished it from other properties in the same zone, with other devices, such as floating zones and planned development districts, which involve a *legislative* decision relating to the creation or alteration of the underlying zones themselves. See *MacKenzie* v. *Planning & Zoning Com-mission*, supra, 146 Conn. App. 433–34. In so doing, the Appellate Court

Tillman *v.* Planning & Zoning Commission

v. *Zoning Commission*, supra, 259 Conn. 430–31 (there was no violation of uniformity requirement in case in which regulation excluding wetlands and slopes from minimum acreage was applied consistently throughout zone); *Veseskis* v. *Zoning Commission*, supra, 168 Conn. 360 ("[t]o require by zoning regulation a buffer strip between one zone of a particular classification and another zone of a different class in one specific instance and not in other instances when zones of these two zone classifications abut clearly violates the statutory uniformity requirement and is exactly the arbitrary and discriminatory use of the police power which the statute was designed to prevent"); *St. Joseph's High School, Inc.* v. *Planning & Zoning Commision*, 176 Conn. App. 570, 599, 170 A.3d 73 (2017) (granting special permit application that does not satisfy applicable regulatory standards "runs afoul of the uniformity requirement" (internal quotation marks omitted)).

Two particular points derived from these authorities warrant specific emphasis. First, the uniformity requirement does *not* require regulations governing adjacent zones to be consistent with one another. Indeed, the plain language of § 8-2 (a) indicates that "regulations in one district may differ from those in another district." See also, e.g., *Abel* v. *Planning & Zoning Commission*, 297 Conn. 414, 431, 998 A.2d 1149 (2010) ("[t]he statutory scheme assumes . . . uniformity within a zone"); *Simko* v. *Ervin*, 234 Conn. 498, 506, 661 A.2d 1018 (1995) ("[i]n accordance with § 8-2, a zoning regulation must be applied uniformly throughout each district"); *Pleasant Valley Neighborhood Assn.* v. *Planning & Zoning Commission*, 15 Conn. App. 110, 114, 543 A.2d 296 (1988) ("§ 8-2 . . . requires intradistrict uniformity, and not uniformity among all districts in a given town" (emphasis omitted)). As discussed previously in this opinion,

expressly noted that the devices named in the latter category "are recognized as legitimate land use tools" in this state. Id., 433.

Tillman *v.* Planning & Zoning Commission

the approval of a planned development district creates a new and independent zone. As a result, the plaintiffs' argument that the uniformity requirement contained in § 8-2 categorically prohibits the use of that device because the application-by-application process inherent in its nature results in inconsistences *with adjacent areas* must fail because that argument relates to interdistrict, rather than intradistrict, variations. See 9 R. Fuller, supra, § 4:5, p. 73 ("the [planned development district] only has to be uniform within itself regardless of the zoning of bordering districts"); T. Tondro, supra, p. 74 ("[a] zoning amendment carving a new zone out of a larger one, or which changes a zone's boundaries in any way, does not violate the uniformity rule because the rule only requires uniformity within a [particular] district, not between districts" (emphasis omitted)).

Second, the uniformity requirement in § 8-2 does not prohibit the commission from blending different types of uses within a particular planned development. Cf. 3 P. Salkin, American Law of Zoning (5th Ed. 2011) § 24:20, pp. 24–44 ("Planned unit development legislation has been challenged on the ground that it does not create districts but permits a mixture of uses in a single district. . . . Even in the states [that] lack specific planned unit development enabling statutes, the argument has been rejected."). The fact that the commission's decision contemplates a mixture of residential, commercial, and professional uses does not violate the uniformity requirement in § 8-2. Even a traditional approach to zoning does not mandate a complete monoculture of uses within a particular zone. See id.

The commission's decision in the present case created a new zone governed by a single set of regulations. Those regulations include both a specific, preapproved mixture of uses for the planned development district as a whole, and a detailed set of area, location, and bulk standards applicable to the various classes and

Tillman *v.* Planning & Zoning Commission

kinds of buildings and structures to be constructed therein. Cf. T. Tondro, supra, p. 75 ("Planned Area Developments (PAD[s]) specify different rules for properties within the PAD than for those outside, allowing the single owner of the PAD to create a district unique to his or her property. Since PADs are usually required to have a large minimum lot area, they are consistent with the uniformity rule because the PAD area can be viewed as the equivalent of a new zoning district . . . ."). We are not persuaded by the plaintiffs' claim that such regulations violate the intradistrict uniformity requirement in § 8-2.

III

The plaintiffs' final claim is that the delineation of separate "development areas" resulted in an unlawful subdivision. Only a brief analysis is necessary to reject this claim. "[I]n order to constitute a subdivision, the clear language of [§ 8-18] has two requirements: (1) [t]he division of a tract or parcel of land into three or more parts or lots, and (2) for the purpose, whether immediate or future, of sale or building development." (Internal quotation marks omitted.) *Cady* v. *Zoning Board of Appeals*, 330 Conn. 502, 510, 196 A.3d 315 (2018). The first prong of this test requires a division of land into three or more distinct "parts or lots . . . ." (Internal quotation marks omitted.) Id.; see also *500 North Avenue, LLC* v. *Planning Commission*, 199 Conn. App. 115, 131–32, 235 A.3d 526 (concluding that "the purpose of the inclusion of 'parts' is to elucidate the meaning of the word 'lots' " and that "the two words are meant to be read together"), cert. denied, 335 Conn. 959, 239 A.3d 320 (2020). We agree with the trial court's assessment that, notwithstanding the fact that the various "development areas" are occasionally referred to in the record as "parcels," there is no indication that the commission's approval of the proposed planned development district actually caused the alteration of

any previously existing property line. Cf. *Alvord Investment, LLC* v. *Zoning Board of Appeals*, 282 Conn. 393, 411, 920 A.2d 1000 (2007) ("a division of the land must take place in order to trigger subdivision review"). In fact, the statement of uses and standards ultimately approved by the commission expressly notes that any subdivision of the subject parcel would require separate approval. The defendant's claim that the commission's decision resulted in an unlawful subdivision must, therefore, fail.

The judgment is affirmed.

In this opinion the other justices concurred.

———————————